Neville **EVANS**, Plaintiff,

v.

The **PORT AUTHORITY OF NEW YORK AND NEW JERSEY,** et al., Defendants.

No. 00 Civ.5753 (LAK).

United States District Court, S.D. New York.

April 5, 2002.

Stephen T. Mitchell, New York City, for plaintiff.

Megan Lee, Milton H. Pachter, New York City, for defendants other than Lee Home.

### MEMORANDUM OPINION

KAPLAN, District Judge.

This employment discrimination action is brought against The Port Authority of New York and New Jersey (the "Authority") and a number of its employees pursuant to Title VII of the Civil Rights Act of 1964, as amended,[1] and 42 U.S.C. § 1981. The individual defendants[2] are sued also under the New York State Human Rights Law ("NYSHRL")[3] and the New York

---

1. 42 U.S.C. § 2000e *et seq.*

2. Plaintiff has abandoned his NYSHRL and NYCHRL claims against the Authority. *See* Pl.Mem.Supp.Amend.Compl. (DI 19), at 3.

3. N.Y.Exec.L. § 296.

City Human Rights Law ("NYCHRL").[4] Plaintiff, an African–American engineer employed in the Authority's Tunnels, Bridges and Terminals Department (the "TB & T"), claims that he repeatedly has been passed over for promotion and subjected to a hostile work environment because of his race and that defendants have retaliated against him for complaining about alleged racial discrimination at the Authority. Extensive discovery having been completed, the matter is before the Court on the motion of the remaining defendants for summary judgment dismissing the complaint. The material facts pertinent to this motion are entirely undisputed except as noted below.[5]

### I. The Factual Background

#### A. Port Authority Practices for Filling Job Vacancies

As this case is concerned chiefly with plaintiff's contention that he repeatedly was passed over for promotion by the Authority, it is useful to begin with an account of the manner in which it fills vacancies in its management ranks.

The Authority, perhaps unlike an organization subject to civil service laws or collective bargaining agreements, is not obliged to solicit applicants for nonexecutive management and field supervisory positions by posting vacancies and providing for a competitive hiring process. A job bulletin describing the position and necessary qualifications may or may not be issued by the Human Resources Department. The department filling the vacancy may exercise also a so-called departmental option selection process, limiting competition for the position to candidates within the department. Finally, the hiring manager may opt not to post the position vacancy at all and make a selection based on a review of a candidate's qualifications and job performance.[6]

This sort of system can be used honestly and fairly. It can be used also for favoritism and/or discrimination. Plaintiff asserts that he was victimized by it on the basis of his race. In considering his claims, however, it is important to bear in mind that the analysis of the specific promotions for which he claims he was passed over on the basis of race and for which he seeks relief varies depending upon whether the job was posted or, in the Authority's vernacular, "bulletinized," and plaintiff actually was an unsuccessful candidate or whether, instead, the individual responsible for filling the vacant position simply picked someone other than plaintiff in circumstances in which plaintiff could not

---

4. N.Y.C.Ad.C. § 8–502.

5. A few preliminary words are necessary in view of the nature of the plaintiff's papers.

 To begin with, plaintiff filed three sets of papers in opposition to the motion, the latter two of which were untimely. The Court nevertheless considers them.

 Second, all three sets of papers consist of affirmations of plaintiff's counsel to which are appended a great many exhibits including affidavits, deposition excerpts, purported Rule 56.1 statements and other materials. These are cited by their docket item numbers, DI 42, DI 49 and DI 50.

 Third, plaintiff submitted four purported Rule 56.1 statements. (DI 42, Ex. H; DI 49, Ex. R; DI 50, Exs. *gg, ii* ) None directly responds to defendants' statement. In consequence, the averments set forth in defendants' Rule 56.1 statement are deemed admitted. S.D.N.Y.Civ.R. 56.1(c); *Baker v. Dorfman,* 239 F.3d 415, 422 (2d Cir.2000); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam). Some of plaintiff's Rule 56.1 statements consist of purported evidentiary material such as plaintiff's counsel's version of plaintiff's resume. Plaintiff belatedly submitted sworn versions, which the Court considers to the extent they would be admissible in evidence. *See* Supp. to Ex. *gg;* Supp. to Ex. *ii.*

6. Def. 56.1 St. ¶ 10.

have applied and may not even have known that a vacancy existed.

In theory, one in plaintiff's position might have mounted two different claims in these circumstances, disparate treatment and disparate impact. The gravamen of the former would be that plaintiff did not get the job in question as a result of intentional discrimination on the basis of race. The latter would not require proof of intentional discrimination. Rather, its essence would be that the system was neutral on its face but had an unjustifiable disparate impact on a protected group of which plaintiff was a member.[7] Given these differences, the evidentiary requirements of the two theories vary.[8] For present purposes, however, it is important to recognize that plaintiff neither has pleaded nor sought to make out a disparate impact claim.[9] Accordingly, there is no issue of disparate impact in the case despite its theoretical availability.

## B. Plaintiff's Experience and the Promotions at Issue

Plaintiff, who holds a bachelor's degree in engineering, was hired to work in the Authority's Engineering Department in 1985.[10] In 1987, he was accepted in a two-year management development program in the TB & T during which he and the other trainees were rotated through six-month assignments within TB & T to gain a better understanding of the department and to develop management skills and abil-

---

**7.** *E.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 431–36, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**8.** "The evidence in [disparate impact] ... cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). As the Supreme Court has made clear, it is the "comparison—between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs—that generally forms the proper basis for the initial inquiry in a disparate-impact case." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 650–51, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

**9.** Plaintiff's memorandum is devoid of any reference to a disparate impact theory. Nor is there evidence, for example, of how many relevant positions were filled without posting and whether African Americans obtained a greater or lesser percentage of positions thus filled than they represented in the pool of qualified persons.

The closest plaintiff comes to this subject is his contention that he and another African American completed an Authority management development program in 1989 and that all of their white peers in the program have reached at least the operations manager level since then, but that they have not. Evans Aff., DI 50, Ex. *aa* ¶¶ 20–27. This does not make out a *prima facie* case of disparate impact because there is no evidence of either the percentage of positions filled by noncompetitive appointment of African Americans or the percentage of the pool of qualified candidates who were African American. Certainly there is no evidence that the pool of qualified candidates was limited to those who completed the management development program.

Accordingly, even if plaintiff had attempted to mount a disparate impact case, he would have failed to establish a *prima facie* case because there is no evidence of a causal connection between the Authority's posting or other hiring practices and the resultant proportion of minority employees in management positions within the TB & T. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706, 712–13 (2d Cir.1998); *see also, e.g., Cortez v. City of New York,* No. 99 Civ. 4304(NRB), 2001 WL 410092 (S.D.N.Y. Apr. 20, 2001) (granting summary judgment dismissing disparate impact claim when "plaintiff present[ed] no statistical evidence that a protected class is adversely affected" by an alleged policy of not considering requests to reschedule drug tests).

**10.** Def. 56.1 St. ¶ 3.

ities.[11] Upon completion of the program, he became a supervisor in the Tolls Pool and Training Center, then worked in the Tolls Program Unit and later the Toll System and Technology program, and eventually became a supervisor in the Operation and Maintenance Services Unit.[12] Apart from the six-month trainee assignments during the management development program, plaintiff never has been assigned to work at an Authority facility such as the Verrazzano or George Washington Bridge or the Lincoln Tunnel.[13]

Although plaintiff, doubtless in consequence of the statute of limitations, seeks relief here only for his failure to be promoted in or after 1997, there are a few earlier events that bear mention so that plaintiff's claims may be evaluated in their total context.

### 1. The Lockette Incidents—1989 & 1990

The first is an alleged instance of racial bias on the part of Allegra Lockette. In 1989, plaintiff attended a meeting at the Staten Island Bridges with Ms. Lockette, a manager there, at which Ms. Lockette became very angry and abusive toward plaintiff, perhaps because she had expected two of his supervisors to attend the meeting rather than he.[14]

A year later, plaintiff became aware of a vacancy at the Staten Island facilities. His manager, Ernesto Butcher, an African American himself,[15] however, told him that he had received a call from Ms. Lockette to the effect that she did not want plaintiff to get the job. Mr. Butcher suggested that plaintiff try to resolve the problem with her.[16] In the course of the conversation, he commented on plaintiff's assertiveness, adding that white people can think of assertiveness by an African American as aggression and that this might account for Ms. Lockette's attitude.[17] Plaintiff then arranged a meeting with Ms. Lockette at which he "said I'm coming here to find out what makes you come to the point of denying me, an African–American, [the] job even though I'm qualified for it."[18] Ms. Lockette responded by suggesting that plaintiff "be more like the other blacks in the Port Authority" such as Mr. Butcher.[19] Plaintiff did not apply for the job.[20] He did, however, complain to Mr. Butcher about Ms. Lockette's behavior but was unhappy with Butcher's reaction and failure to intervene.[21]

### 2. The Brown Incident—1992

In 1992, plaintiff and a white co-worker, Ray Brown, had a spat concerning "coffee money."[22] Brown threatened plaintiff, who later overheard Brown use the word "nigger" while speaking to someone else on the telephone. He complained to Mr. Butcher, who took no action.[23]

11. *Id.* ¶ 4; *see also* Evans Dep., DI 49, Ex. A, at 43.

12. Def. 56.1 St. ¶¶ 5–8.

13. *Id.* ¶ 9; *see* Evans Aff., DI 50, Ex. *aa* ¶ 10.

14. Evans Dep., DI 49, Ex. A, at 147–51.

15. *Id.* at 154.

16. *Id.* at 147–52.

17. *Id.* at 152.

18. *Id.* at 153.

19. *Id.* at 154.

20. *Id.*

21. Evans Aff., DI 50, ¶¶ 30–32.

22. *Id.* ¶ 41.

23. *Id.*

### 3. Plaintiff's Early Complaints

In 1995, plaintiff complained to his department director about what he perceived to be "official misconduct by Port Authority executive staff."[24] His complaint was investigated within TB & T, and it was determined that there was no discrimination by Authority executive staff.[25] Plaintiff did not file charges with the EEOC or bring suit as a result of his 1995 complaint.[26]

### 4. The Cardoza Complaints

One Horace Cardoza, who is a plaintiff in another employment discrimination suit against the Authority, has submitted an affidavit stating that he had complaints about racial discrimination in 1996, 1997 and early 1998, which at some unspecified time he brought to the attention of Frederick Myers, then Director of the Authority's Office of Equal Opportunity and also an African American.[27] Mr. Cardoza states that Mr. Myers said that he was the "head nigger in charge"[28] and that he had no power to change things at the Authority, and that Mr. Myers was hostile towards him and dismissive of his complaints.[29] Mr. Butcher also allegedly was unresponsive to Mr. Cardoza's complaints.[30]

This brings us to the events directly at issue in this action.

### 5. Failures to Promote—1997 through September 2000

### a. December 1997—to Supervisor, Bridge Operations at George Washington Bridge (Cpt.[31] ¶ 34)

In February, 1997, the Authority issued a bulletin stating that the position was available and received several applications.[32] Plaintiff did not apply, and he is entitled for present purposes to the assumption that he was unaware of the opening despite the job posting.[33] After interviewing the candidates who applied as a result of the posting, Adrienne Holmes, an African–American woman involved in the hiring process, decided that none was qualified.[34] She then obtained the permission of her supervisor to approach Robert Eadicicco about the job, did so, and ultimately convinced him to take the position.[35] While plaintiff claims that he was more qualified then Mr. Eadicicco, he concedes that Ms. Holmes was not aware of his qualifications for the job.[36]

---

**24.** Def. 56.1 St. ¶ 23.

**25.** Id.

**26.** Id. ¶¶ 23–24.

**27.** Cardoza Aff., DI 50, Ex. ff ¶¶ 1–6.

**28.** Id. ¶ 5.

**29.** Id. ¶¶ 5–7.

**30.** Id. ¶¶ 8–12.

**31.** The references are to the proposed amended complaint attached to plaintiff's motion for leave to amend (DI 19), which is identical in all material respects to the original save the addition of allegations relating to Dr. Duke, the deletion of claims against the Authority under the NYSHRL and the NYCHRL, and

the addition of a failure to promote and retaliation claim relating to events in September 2000. The Court denied plaintiff leave to add this last claim on January 24, 2002, but subsequently granted leave to amend upon reconsideration in a March 19, 2002 order. Plaintiff has yet to file an amended complaint reflecting the Court's January 24 and March 19 orders.

**32.** Def. 56.1 St. ¶ 11; Holmes Aff. ¶ 5 & Ex. J.

**33.** Evans Aff., DI 50, Ex. aa ¶¶ 17–18.

**34.** Holmes Aff. ¶¶ 6, 43.

**35.** Id. ¶¶ 6–7.

**36.** Pl.Mem. 16 ("Holmes was unaware of Mr. Evans' qualifications for the position.")

b. *1998—to Manager, TB & T Operations and Maintenance Services (Cpt.¶ 40)*[37]

The complaint alleges that plaintiff was passed over for this position, which he asserts was not bulletinized, in retaliation for prior complaints about racial discrimination at the Authority.[38] His memorandum states further that he was supervisor of TB & T Operations and Maintenance Services[39] when the vacancy arose, had acted temporarily as manager, was recommended for the job, and therefore was in line for the promotion but the position was not posted.[40] His affidavits and deposition, to the extent it has been made of record, however, do not address these events. The only evidence of record therefore is that of the defendants, which stands uncontroverted. According to their proof, the job was posted and plaintiff was considered, but Mark Muriello, the appointing authority in this case, chose Adrienne Holmes, an African–American woman, in preference to plaintiff because he thought her better qualified.[41]

c. *August 1998—to Supervisor, E–ZPass Customer Service (Cpt.¶ 19)*

Plaintiff's memorandum states that he "dismisses his claim with respect to Maria Malone Hodges receiving this position."[42]

d. *August 1998—to Manager, TB & T Operations at Staten Island Bridges (Cpt.¶ 23)*

Plaintiff's complaint about this promotion begins in 1995 with the appointment of Patricia Trimarchi to the subordinate position of supervisor (or unit head), TB & T Operations at Staten Island Bridges. He contends that Ms. Trimarchi was appointed in preference to plaintiff, despite plaintiff's superior qualifications,[43] and that this led to her promotion in 1998 to the manager position without the job having been posted and thus without plaintiff having been given an opportunity to compete for the latter job.[44]

Mr. Butcher, the African–American man who appointed Ms. Trimarchi to the manager position, states that he did so because she was uniquely qualified in view of her prior service at the Staten Island Bridges.[45] He denies that race was a factor.[46]

e. *September 1998—to Manager, TB & T Operations at Holland Tunnel (Cpt. ¶ 25)*

In this instance, the Authority posted the position and plaintiff applied. Both he and the successful white applicant, Mr. Curnyn, were interviewed. Mr. Butcher states that Mr. Curnyn was offered the position rather than Mr. Evans because he scored higher on a panel interview than Mr. Evans.[47] But he does not claim to

---

**37.** This complaint is based solely on a claim of retaliatory denial of promotion.

**38.** Cpt. ¶ 40.

**39.** It is unclear from the record whether plaintiff was *the*—that is, the only—supervisor of TB & T Operations and Maintenance Services, or rather *a*—that is, one among many—supervisor in this particular branch of the TB & T. *Compare* Pl.Mem. 20–21, *with* Def. 56.1 St. ¶ 8.

**40.** Pl.Mem. 20–21.

**41.** Muriello Aff. ¶ 2.

**42.** Pl.Mem. 25.

**43.** Evans Dep., DI 49, Ex. C, at 399, 402–03.

**44.** Pl.Mem. 20.

**45.** Butcher Aff. ¶¶ 13–15.

**46.** *Id.* ¶ 21.

**47.** *Id.* ¶ 18.

have been a member of the interview panel,[48] so his denial that race played a part in the appointment cannot be based on personal knowledge.[49]

Defendants submitted interview evaluation forms filled out by each of the panel members for both Mr. Curnyn and Mr. Evans. The evaluation forms are broken into eleven "dimensions," ostensibly measuring the degree to which a candidate's responses demonstrated his or her possession of certain valued characteristics.[50] For each of the eleven dimensions, the interviewer was asked to rate the candidate on scale of one to ten (one being "not acceptable" and ten being "outstanding"). The scores for each dimension then were added to create a "total" score for each candidate.[51] Using only their employee identification numbers, the candidates were ranked based on their total scores.[52] A spreadsheet document showing the ranking of the candidates indicates that Mr. Curnyn scored third highest out of thirteen, with a total score of 81.33, and that Mr. Evans scored fourth highest, with a total score of 78.00.[53]

48. While the defendants' memorandum asserts that two of the three members of the interview panel were black, *see* Def.Mem. 10, their affidavits do not identify the panel and thus do not appear to support that assertion.

49. Butcher Aff. ¶¶ 16–18, 21.

50. DI 30, Exs. I, J. The eleven dimensions are as follows: analysis, judgment, maximizing performance, initiative, tolerance for stress, planning and organization, follow-up, teamwork/cooperation, customer service orientation, writing communication, and oral communication.

51. *Id.*

52. *Id.*

53. *Id.*

For purposes of this motion, plaintiff is entitled to the assumption that Ronell Greene, an African–American member of the panel, told plaintiff after the decision was made that Joe Bardzilowski, whom plaintiff refers to as the "manager of the facility," had the "final say" in the decision and that plaintiff was the better qualified person for the job.[54] Similarly, plaintiff is entitled to the assumption that Mr. Green told plaintiff that Mr. Bardzilowski said that Mr. Curnyn was chosen for the position over Mr. Evans because he was a "better fit" for the position.[55]

f. *February 1999—to Manager, TB & T Physical Plant at Holland Tunnel (Cpt.¶ 27) and to Manager, TB & T Physical Plant at Staten Island Bridges (id.¶ 29)*

These jobs were posted.[56] Although the evidence is in conflict on this point, the Court is obliged to assume, in plaintiff's favor, that an engineering degree was a listed qualification for the jobs.[57] Mr. Prince, the successful applicant for the Holland Tunnel job, and plaintiff had such degrees,[58] while Mr. McKee, who was giv-

54. Evans Dep., DI 49, Ex. B, at 242–43. Mr. Greene's statements in this particular context are not inadmissible hearsay because Mr. Greene played a major role in the employment decision about which the statements were made. Thus, his statements were made in the scope of his employment, making them admissions of a party opponent. *See* discussion *infra* Part I.C. regarding FED.R.EVID. 801(d)(2)(C).

55. Evans Dep., DI 49, Ex. C, at 458–59.

56. Def. 56.1 St. ¶ 18.

57. *Compare* Bardzilowski Dep., DI 49, Ex. L, at 22–23, *with* Greene Dep., DI 49, Ex. G, at 25–26.

58. Bardzilowski Dep., DI 49, Ex. L, at 22–23, 45.

en the Staten Island job, did not.[59] According to the Authority, Messrs. Prince and McKee were selected because they performed better than plaintiff in their interviews.[60] Defendants did not submit interview evaluation forms or spreadsheets ranking the candidates for these positions. There is evidence in the record from which a jury could conclude that Messrs. Greene and Bardzilowski, two members of the interview panels for these positions, did not review Mr. Prince's personnel file and were not aware that Mr. Prince once had failed a drug test and allegedly absconded with an Authority motor vehicle.[61]

### g. January 2000—to Supervisor, E–Zpass Customer Service (Cpt. ¶ 31)

In 2000, Mr. Philmus appointed Daniel Moffit to fill this position, apparently without posting the job.[62] Plaintiff challenges the appointment only on the ground that defendants had a practice of giving "mobility assignments" [63] only to white persons.[64] But plaintiff has produced no evidence of any such practice.

### h. January 2000—to Manager, TB & T Operations at George Washington Bridge (Cpt. ¶ 34)

Plaintiff concedes that he never applied for this job.[65] He contends, however, that he approached Mark Muriello, an assistant department director to whom he reported, about the job in November or December 1999. Mr. Muriello, according to plaintiff, told plaintiff that he felt plaintiff qualified for the job and would make sure that the job was posted and that plaintiff had an opportunity to apply for it.[66] Nevertheless, in January 2000, Kenneth Philmus, the TB & T director and Mr. Muriello's superior, at the request of the General Manager of the George Washington Bridge, Stephen Napolitano, appointed Robert Eadicicco Manager of Operations at that facility without posting the job.[67] The request ostensibly was based on Mr. Eadicicco's involvement with the so-called ITS system, an on-going project with which he had become familiar as supervisor of TB & T operations at the Bridge,[68] a position he had held since December 1997. There is no evidence that either Mr. Philmus or Mr. Napolitano was aware of the alleged conversation between plaintiff and Mr. Muriello.

### i. September 2000—to Manager, TB & T Operations at Holland Tunnel (Cpt. ¶ 147)

The Authority issued a job bulletin for this position.[69] Plaintiff applied for it and was interviewed by Robert Durando, the General Manager of the Holland Tunnel, and Mark Duffy, a representative from the human resources department.[70] Following interviews of several candidates, Mr. Du-

---

59. *Id.* at 45.

60. *Id.* at 28–29, 45.

61. Greene Dep., DI 49, Ex. G, at 29–35; Bardzilowski Dep., DI 49, Ex. L, at 25–28.

62. Def. 56.1 St. ¶ 19.

63. Mobility assignments are temporary lateral transfers often used for job training. Greene Dep., DI 49, Ex. G, at 108–09; Philmus Dep., DI 49, Ex. P, at 109.

64. Pl.Mem. 25.

65. Evans Dep., DI 49, Ex. C, at 477.

66. *Id.* at 477–78; Evans Dep., DI 42, Ex. G, at 356.

67. Philmus Aff. ¶¶ 4–5.

68. *Id.*

69. Def. 56.1 St. ¶ 21.

70. Evans Aff., DI 59, Ex. A, at 489; Philmus Aff. ¶ 21.

rando recommended that Anthony Carvagno receive the position. Mr. Carvagno had been the Supervisor of Bridge Operations at the Staten Island Bridges from 1998 until March 2000 and the Supervisor of Operations at the Lincoln Tunnel thereafter.[71] Mr. Philmus agreed with Mr. Durando's recommendation and Mr. Carvagno received the position.[72] Leonard Hicks, an African–American man who was Supervisor of Operations at the Holland Tunnel at this time, also applied for the position and was interviewed by Mr. Durando and Mr. Duffy, but was not offered the position.[73]

### 6. Hostile Work Environment—2000

The hostile work environment claim, apart from whatever is implicit in what has been said already, appears to have two aspects, the first a chain of events directed at plaintiff that allegedly began in late February or early March 2000 and the second a general contention that the Authority systematically ignores or inadequately investigates complaints of racial discrimination.

### a. The Office Taping Incident

In late March 2000, plaintiff attended a meeting conducted by Mr. Philmus with Mr. Muriello's staff at which Mr. Philmus first made a presentation and then opened the floor for questions.[74] Plaintiff and Rodrigo Ortiz raised concerns about the procedure used to promote Mr. Eadicicco to Manager of Operations at the George Washington Bridge, i.e., noncompetitive appointment. There was an exchange of views, and all concur that there was strong disagreement between plaintiff and Philmus.[75] Plaintiff contends, and the Court assumes for purposes of this motion, that he complained that the practice of making noncompetitive appointments was discriminatory.[76]

Following the meeting, plaintiff returned to his office and found that masking tape had been criss-crossed over the door opening and a packet of job bulletins affixed to the tape.[77] Although plaintiff's immediate reaction is a matter of dispute, the Court assumes, in plaintiff's favor, that he was angry. In any case, he called his manager, Ms. Holmes, to come to his office to see what had occurred.[78] When she arrived, plaintiff showed her the tape across his door, told her that he believed he was being harassed for complaining about racial discrimination, and asked that she investigate to find out who had done it.[79] Ms. Holmes nodded affirmatively, told plaintiff to remove the tape, and returned to her office.[80]

On the following day, Ms. Holmes reported the incident to her supervisor, Mr. Muriello, although she did not tell him that plaintiff thought the incident racially motivated. He told a Ms. Papageorgis, apparently the immediate supervisor of those whose workplaces were in the area, to tell her staff that this sort of incident would not be tolerated in the workplace.[81]

---

71. Philmus Aff. ¶ 21.

72. *Id.* ¶ 22.

73. Evans Aff., DI 59, Ex. A, at 499–500.

74. Philmus Aff. ¶ 6.

75. *See id.* ¶¶ 6–9.

76. Evans Aff., DI 42, ¶¶ 1–7; Evans Aff., DI 50, Ex. *aa* ¶¶ 1–7.

77. Holmes Aff. ¶¶ 13–14.

78. Evans Dep., DI 49, Ex. C, at 508–09.

79. *Id.* at 515–18.

80. *Id.* at 518–20.

81. Muriello Aff. ¶ 10.

On April 16, 2000, plaintiff sent a memorandum to the Authority's chief of staff describing the taping incident as "an act of harassment" and complaining of Mr. Philmus's "fervent verbal attack" against him at the March meeting.[82] When that letter, which had not been copied to any TB & T staff,[83] came to Mr. Philmus' attention, he directed Mr. Muriello to investigate.[84] Mr. Muriello did so. In due course, Lee Home, an Asian–American man who had been present at the late March meeting, confessed to having taped the door as a "practical joke," ostensibly to ease some of the tension from the staff meeting with laughter.[85] He tendered a written apology to the plaintiff on May 11, 2000.[86]

Plaintiff was afraid to work at his desk after the incident and, presumably in the period from late March until early May, disliked coming to work because he did not know who was responsible for the taping.[87]

### b. The Meeting with Muriello and Crowley

In late February or early March 2000, plaintiff met with two assistant directors of the TB & T, Mark Muriello and Joanne Crowley.[88] According to their testimony,[89] plaintiff expressed concerns about his perception that some jobs were filled without posting and that this worked to the disadvantage of minority employees.[90] He said that he was not talking about himself, but was raising the "concerns of minorities" in the TB & T.[91] Ms. Crowley stated that she did not consider the promotional practices in the department to be discriminatory.[92] Her deposition is susceptible of the inference that she took no further action.[93]

### c. The May Meeting and Medical Department Incident

In the meantime, more trouble was brewing.

In early May, during Ms. Holmes' weekly staff meeting, plaintiff interrupted to state his belief that the taping incident had been racially motivated and a product of his challenge to the hiring decisions of the department director, Mr. Philmus.[94] Ms. Holmes regarded her weekly staff meeting as an inappropriate venue for these complaints, particularly because plaintiff never had discussed his concerns with her.[95] She considered his interruption inappro-

---

**82.** Philmus Aff. ¶ 11 & Ex. F; *see* Muriello Aff. ¶ 11.
 Plaintiff asserts that the letter assigned a racial motive to the taping incident. The letter, however, does not bear this out.

**83.** Muriello Aff. ¶ 11.

**84.** Philmus Aff. ¶ 13.

**85.** Muriello Aff. ¶¶ 11–13; Home Dep., DI 42, Ex. B, at 21.

**86.** DI 42, Ex. C. It is apparent, if only indirectly, from Home's formal apology that at least Home was aware that Evans considered the taping incident to have a racial component. *See id.* ("As an Asian–American, I have experienced the same frustrations.").

**87.** Evans Aff., DI 50, Ex. *aa* ¶¶ 8–9; Evans Aff., DI 42, Ex. F ¶¶ 8–9.

**88.** Muriello Dep., DI 49, Ex. F, at 17.

**89.** Plaintiff's affidavits and the excerpts of depositions that he submitted do not contain his account of the meeting. In consequence, defendants' version is undisputed.

**90.** Muriello Dep., DI 49, Ex. F, at 17–18; Crowley Dep., DI 49, Ex. I, at 15–21.

**91.** Muriello Aff. ¶ 6.

**92.** *Id.*

**93.** Crowley Dep., DI 49, Ex. I, at 15–21.

**94.** Holmes Aff. ¶ 18.

**95.** *Id.* ¶ 19.

priate also because Mr. Muriello was investigating the complaint plaintiff had made to the Authority's chief executive officer.[96] On May 23, 2000, she told plaintiff that his behavior at the staff meeting had been inappropriate and provided him with a counseling memorandum summarizing the conversation.[97] While Ms. Holmes agreed with plaintiff that the taping incident had been inappropriate, she objected to his raising personal grievances at her staff meetings and made clear that she would not tolerate such behavior in the future.[98]

On the following day, Ms. Holmes learned that plaintiff had gone to the medical department where he was found "not fit for duty" and sent home.[99] She then learned that he was required to report to the clinic on May 26 and confirmed that information with the medical staff.[100] But on May 26, she received a voice mail message from plaintiff in which he stated that he would not report to the medical department until after he saw his personal physician again, which was scheduled to be on June 1.[101]

Following some further back and forth, Ms. Holmes on June 14 received a medical fitness evaluation on plaintiff from the medical department which advised that he had failed to show up for a scheduled appointment on June 9 and that he was being referred for "administrative disposition" for failing to cooperate with the medical department.[102] The medical department did not then know that plaintiff had

made any complaints of discrimination.[103] After consulting the director of the department, Ms. Holmes called plaintiff at home and left a message on his answering machine. He did not return the call until that afternoon, when he knew that Ms. Holmes would be in a regular meeting. She made several additional efforts to telephone him that day and the next, but the calls were not answered.[104]

On June 16, Ms. Holmes received a copy of a June 12 letter from plaintiff's attorney to Mr. Williams, an employee in the Authority law department, in which plaintiff's attorney stated that plaintiff would not report to the medical department for examination and added that if the Authority insisted that he do so, counsel would regard that insistence as "another act of racially retaliatory discrimination."[105] Mr. Williams provided Ms. Holmes also with a copy of his response to counsel's letter, in which he set forth the rules and regulations of the Authority requiring employees to comply with medical department directives and advised that if plaintiff failed to cooperate with the medical department, his status would be changed from "sick to absent without leave."[106]

On June 22, Ms. Holmes learned that plaintiff had not appeared for his June 9 medical examination and that there had been no other contact with him since that date. On June 30, she wrote to plaintiff, advising that he had been placed on AWOL status effective June 12 based on

**96.** *Id.* ¶ 20.

**97.** *Id.* ¶ 22 & Ex. M.

**98.** *Id.*

**99.** *Id.* ¶ 23.

**100.** *Id.* ¶ 24.

**101.** *Id.* ¶ 26.

**102.** *Id.* ¶ 29 & Ex. O.

**103.** Martin Aff. ¶ 20.

**104.** Holmes Aff. ¶¶ 30–32.

**105.** *Id.* ¶ 33 & Ex. P.

**106.** *Id.* ¶ 34 & Ex. Q.

his failure to report on June 9 and that he would be carried on AWOL status as long as he failed to cooperate with the medical department.[107]

Plaintiff responded by e-mail on July 4, 2000, asserting—for the first time—that a medical department nurse, Ms. King, had called his wife and told her that plaintiff had not been obliged to report on June 9.[108] This prompted further inquiry by Ms. Holmes, who learned that Ms. King had so stated to plaintiff's wife,[109] although that fact was not known to the doctor and the absence coordinator in the medical department upon whom Ms. Holmes had relied.[110] Accordingly, the Authority retracted the medical disposition letter and sent plaintiff a check for his back pay by Federal Express.[111]

The procedure followed in plaintiff's case was the same as that followed with respect to any employee who failed to cooperate with the medical staff.[112]

## C. Evidentiary Issues

Thus far, the description of the facts upon which plaintiff bases his case rests on material of clear pertinence to the motion. But plaintiff relies also upon two statements allegedly made to him by other Authority employees, at least one of which potentially is important to the analysis of the defendants' motion and both of which are at best of questionable admissibility.

First, one of plaintiff's affidavits states that "Rodrigo Ortiz told me that Ernesto Butcher told him that I never would be promoted in the Tunnels, Bridges & Terminals Department as long as he had any control over TB & T because I complained about racial discrimination and inculpated him as a part of my complaint."[113] As Mr. Butcher was involved in several of the promotion decisions in which plaintiff claims he was passed over, the significance of the alleged statement is evident.

Second, plaintiff claims also that he "was told by all of my managers that the implementation of E–ZPass was one of the most important projects at the Port Authority and I also was told it was more important than the installation of the Intelligent Transportation System."[114] This arguably would bear on the veracity of the Authority's explanation for its decision to promote Mr. Eadiciccio to the post of Manager, TB & T Operations at the George Washington Bridge in January 2000.

It therefore is necessary to consider whether these statements appropriately are considered on this motion.

### 1. General Principle

Rule 56(e) provides that "[s]upporting and opposing affidavits [on summary judgment motions] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

---

**107.** *Id.* ¶ 35 & Ex. R.

**108.** *Id.* ¶ 36 & Ex. S.

**109.** *Id.* ¶ 37.
 Ms. King did so on her own authority on June 9, having overheard one end of a conversation between Dr. Duke and Reynald Altema, M.D., plaintiff's physician. King Dep., DI 49, Ex. K, at 15–16; *see also* Altema Aff., DI 50, Ex. *ll, passim.*

**110.** Holmes Aff. ¶¶ 36–37; Martin Aff. ¶ 12.

**111.** Holmes Aff. ¶¶ 38–39.

**112.** *Id.* ¶ 40.

**113.** Evans Aff., DI 50, Ex. *aa* ¶ 71.

**114.** *Id.* ¶ 64.

therein."[115] Were there any doubt as to its meaning, it long ago was eliminated by a parade of decisions making clear that only admissible evidence may be considered in passing on motions for summary judgment.[116] The Court therefore must determine whether plaintiff's testimony as to these out-of-court statements would be admissible at trial.

### 2. Plaintiff's Account of the Alleged Ortiz Statement

Plaintiff's account of Mr. Ortiz's alleged statement consists of two elements: (a) Ortiz's alleged statement to plaintiff, and (b) Butcher's alleged statement to Ortiz. Each aspect of plaintiff's averment therefore must be considered.[117]

Butcher's alleged statement to Ortiz—that plaintiff never would be promoted as long as Butcher had anything to say about it because of plaintiff's complaints—presents no hearsay problem because it is not offered for the truth of the matter asserted, but as circumstantial evidence of Mr. Butcher's state of mind.[118] It therefore would be admissible at trial over hearsay objection if it were adduced from a person having personal knowledge of the state-

ment. Plaintiff, however, has offered no such evidence on this motion. Rather, he offers his own testimony that Ortiz told him that Butcher made the alleged statement to Ortiz. Hence, plaintiff offers Ortiz's statement for the truth of the matter asserted by Ortiz—*viz.*, that Butcher made the statement to him. Ortiz's statement therefore is an out-of-court declaration offered for its truth, and it is admissible only if it qualifies as non-hearsay under Rule 801.[119]

■ The only arguable ground for receiving Ortiz's statement is as an admission of a party opponent—the Authority—*i.e.*, as a "statement by a party's agent or servant concerning a matter within the scope of the employment, made during the existence of the relationship."[120] The question, then, is whether Ortiz's statement concerns a matter within the scope of his employment. On the evidence presented, the answer is no.

■ There is no evidence that Mr. Ortiz was plaintiff's supervisor or played a role in any of the employment decisions at issue in this case. As far as the record reveals, therefore, he was plaintiff's co-

---

**115.** FED.R.CIV.P. 56(e).

**116.** *E.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65–66 (2d Cir.1997).

**117.** *See* FED.R.EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rules provided in these rules.").

**118.** *E.g., Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999) (decision maker's statement that he did not want "skirts" working for him was

not hearsay because offered to show state of mind). *See generally United States v. Salameh*, 152 F.3d 88, 112 (2d Cir.1998) ("Where ... the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given by Rule 801(c) ... because it [is] not offered to prove the truth of the matter asserted." (first alteration in original)), *cert. denied sub nom. Abouhalima v. United States*, 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999).

**119.** *See* FED.R.EVID. 801. Plaintiff does not suggest that Ortiz's statement comes within any exception to the hearsay rule, and the Court's independent review has revealed none.

**120.** FED.R.EVID. 801(d)(2)(D).

worker.[121]

■ The Second Circuit has not specifically addressed the precise issue whether a statement by a co-worker relating the alleged statement of a supervisor with decision-making authority concerns a matter within the scope of the co-worker's employment, although one case held *sub silentio* that it does not.[122] Other circuits to reach the issue, however, uniformly have determined that such statements are not within the scope of employment when the declarant neither is the plaintiff's supervisor nor has a significant role in the employment decision at issue.[123] This approach dovetails with the more general principle, recognized in the Second Circuit, that statements regarding employment matters *are* within the scope of the declarant's employment if the declarant was "an advisor or other significant participant in the decision-making process that is the subject matter of the statement." [124] Both

121. The burden of establishing admissibility, of course, is with the proponent of the evidence. *See, e.g., United States v. Robbins,* 197 F.3d 829, 838 (7th Cir.1999) (proponent of out-of-court statement bears burden of proving it fits into hearsay exception); *United States v. Pluta,* 176 F.3d 43, 49 (2d Cir.) (proponent of evidence bears burden of authentication), *cert. denied,* 528 U.S. 906, 120 S.Ct. 248, 145 L.Ed.2d 208 (1999); *Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986) ("Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment."); *United States v. Rubin,* 609 F.2d 51, 79 (2d Cir.1979) (government had burden of establishing admissibility of prior consistent statement over hearsay objection), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

122. In *Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir.2000), the Second Circuit held that testimony by the plaintiff that other firefighters told her of statements by a supervisor was inadmissible to prove that the supervisor actually made the statements. *Id.* at 155. *Howley* does not explicitly address the scope of the employment issue. The result reached, however, is entirely consistent with the approach taken by other circuits and the Court's decision here.

123. *E.g., Jacklyn,* 176 F.3d at 927–28 (statements not within scope of employment when declarant was not plaintiff's supervisor during relevant time period and was not involved "in any of the critical appraisals or her performance that preceded her leaving work"); *Zaben v. Air Prods. & Chems., Inc.,* 129 F.3d 1453, 1456–57 (11th Cir.1997) (plaintiff could not testify to statements made to him by two co-workers to the effect that the company wanted to get rid of its older co-workers because co-workers had no supervisory or decision-making authority and they could not relay statements of unidentified superiors); *Breneman,* 799 F.2d at 473 (statements not within scope of employment when declarants relating what decision maker said were not involved in the company's discharge of plaintiff); *Wood v. Dalton,* No. Civ.A. 99–1(JMF), 2000 WL 1174985, at *2 (D.D.C. July 7, 2000); *Shepley v. E.I. DuPont De Nemours and Co.,* 722 F.Supp. 506, 515 (C.D.Ill.1989); *cf. Bevan v. Honeywell, Inc.,* 118 F.3d 603, 610–11 (8th Cir.1997) (statement by plaintiff's immediate supervisor relating what supervisor with greater authority had said regarding relevant employment decision was within scope of immediate supervisor's employment); *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1215–16 (3d Cir.1995) (holding that plaintiff's co-worker could testify to what supervisor had said to him regarding "criteria utilized by management in making decisions on hiring, firing, compensation, and the like") (no double hearsay issue because the co-worker himself, rather than plaintiff, was offering testimony).

124. *United States v. Rioux,* 97 F.3d 648, 661 (2d Cir.1996) ("[T]he defendant need not be the 'final decisionmaker' on employment matters for his statement on those matters to be deemed within the scope of his agency. Rather, he need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement."); *see, e.g., Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1238 n. 1 (2d Cir.1995) (statements of intermediate supervisors relating statement of superior with decision-making authority were within scope of

are consistent with the hornbook notion that "not everything that relates to one's job falls within the scope of one's . . . employment" [125] and that the statement at issue must be "related to the declarant's duties." [126]

Here, there is no evidence that Mr. Ortiz was plaintiff's supervisor, that he played a role in any relevant decision-making process, or that his alleged statement to plaintiff was related in any way to his duties for the Authority. Accordingly, Mr. Ortiz's alleged statement to plaintiff is not an admission by the Authority and, as it is offered for its truth, is inadmissible hearsay.

As the foregoing makes clear, this conclusion is dictated by Rule 56(e) and by the Federal Rules of Evidence. But the Court notes also that there is nothing harsh about it, as plaintiff had every opportunity to adduce the evidence in admissible form.[127] Plaintiff took Mr. Ortiz's deposition and certainly could have adduced testimony from him about the alleged statement. But the portion of the deposition he offered in opposition to this motion contains no such evidence. He also could

have offered an affidavit or declaration of Mr. Ortiz, assuming that Mr. Ortiz supports plaintiff's version of the events. But he did not do that either. The statement is not properly considered on this motion.

### b. The Alleged E–ZPass Statement

The second of the statements of questionable admissibility is plaintiff's contention that he "was told by all of my managers that the implementation of E–ZPass was one of the most important projects at the Port Authority and I also was told it was more important than the installation of the Intelligent Transportation System." [128]

■ In this instance, plaintiff is reiterating the alleged out-of-court statement or statements of unidentified "managers" in order to prove the truth of the matters asserted. The only possible ground for admissibility is that the statements by the unidentified "managers" are admissions of the Authority. As the alleged "managers" are not identified, however, it is impossible to tell whether the statements concern matters within the scope of their employ-

---

employment when one of the intermediate supervisors had been instructed to fire the plaintiff and the other was plaintiff's immediate supervisor who reported to superior on plaintiff's performance and status); *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir.) (statement by supervisor who "had ostensible authority over and took part in personnel decisions regarding hiring and firing of sales staff" was within scope of employment, and was admissible when testified to by nonplaintiff employee who heard the statement first hand) (no double hearsay issue), *cert. denied*, 506 U.S. 975, 113 S.Ct. 467, 121 L.Ed.2d 375 (1992); *see also Zaben*, 129 F.3d at 1456 ("[S]tatements made by a supervisory official who plays some role in the decision making process are generally admissible.").

**125.** *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir.1998).

**126.** 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.33[2][c], at 801–69 (Joseph M. McLaughlin ed., 2d ed.2001).

**127.** *See, e.g., Howley*, 217 F.3d at 155 (testimony of fellow firefighters would be admissible to prove that supervisor made statement, but plaintiff could not testify to what fellow firefighters said they heard supervisor say); *Jacklyn*, 176 F.3d at 928 ("While plaintiff could have relied on the 'skirts' comment if Grew was willing to testify that he heard Erlandson say it, it is not admissible through the affidavit or testimony of plaintiff."); *Abrams*, 50 F.3d at 1215–16; *Zaken*, 964 F.2d at 1323.

**128.** Evans Aff., DI 50, Ex. *aa* ¶ 64.

ment.[129] Accordingly, the statements are not admissions and are inadmissible.

## II. Failures to Promote

### A. Disparate Treatment

Failure to promote claims are analyzed under the *McDonnell Douglas*[130] burden shifting analysis.[131] The plaintiff has the initial burden of making out a *prima facie* case. As plaintiff's memorandum states, in order to do so a plaintiff "must establish (1) that the plaintiff falls within the protected group, (2) that the plaintiff applied for a position for which he was qualified, (3) that the plaintiff was subject to an adverse employment decision, and (4) that the adverse employment decision was made under circumstances giving rise to an inference of racial discrimination." [132]

If the plaintiff makes out a *prima facie* case, the burden of production shifts to the employer who may defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision. If the employer offers a justification of its action which, if believed, would allow a finding of no unlawful discrimination, then the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is "discrimination *vel non.*" [133]

---

**129.** *E.g., Zaben,* 129 F.3d at 1455–57 (excluding statement that "they [meaning higher officials at the company] was [sic] talking about getting rid of older employees" as inadmissible hearsay because declarants were unidentified (alterations in original)); *Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1002–03 (3d Cir.1988) (excluding statement that "they wanted a younger person" as inadmissible hearsay because declarants were unidentified, under circumstances indicating that "they" were company officials with promotion/hiring authority); *see, e.g., Pittman by Pittman v. Grayson,* 149 F.3d 111, 124 (2d Cir.1998) (statement of airline stewardess about "a story that [she had] heard" not admissible because source of statement unidentified), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999); *Vazquez v. Lopez–Rosario,* 134 F.3d 28, 34 (1st Cir.1998) (unattributed statements not admissible because impossible to tell whether declarant fit into party-opponent definition); *Zaken,* 964 F.2d at 1323–24 (statement regarding reason for plaintiff's termination excluded because not attributed to specific individual); *Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n,* 551 F.2d 1136, 1138 (8th Cir.1977) (reiteration of statement inadmissible because author of statement unknown); *Nat'l Communications Ass'n, Inc. v. AT & T,* No. 97 Civ. 1735(LAP), 1998 WL 118174, at *10 n. 7 (S.D.N.Y. Mar. 16, 1998) (admission of unattributed statements improper under Rule 801(d)(2)(D) because agency relationship cannot be determined); *cf., e.g., Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 537–39 (2d Cir.1992)

(admitting statement of unidentified ski resort employee who had responded to call for help after plaintiff had fallen in walkway, because there was sufficient circumstantial evidence to show that security guard was agent of defendant and speaking on matter within the scope of his agency); *Davis v. Mobil Oil Expl. & Prod., S.E., Inc.,* 864 F.2d 1171, 1173–74 n. 1 (5th Cir.1989) (admitting hearsay statement of unnamed declarant where witness provided sufficient evidentiary basis for concluding declarant was agent speaking within scope of agency).

Plaintiff has offered no circumstantial evidence regarding the context in which the statements were made that would enable the Court to make the Rule 801(d)(2)(D) determination despite the lack of specific identification.

**130.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**131.** *Howley,* 217 F.3d at 150.

**132.** Pl.Mem. 4 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *accord, e.g., Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 838 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996).

**133.** *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 102 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.

■ With respect to this last stage in the analysis, plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him.[134] The Second Circuit has instructed the district courts to examine the record as a whole to determine "whether a jury could reasonably find an invidious discriminatory purpose on the part of the employer."[135] Since discrimination plaintiffs rarely have direct evidence of discriminatory animus infecting the promotion decision, they often "must defeat summary judgment on the strength of [their] *prima facie* case combined with circumstantial evidence that [the] stated reason for failing to [promote them] is pretext."[136] A case-by-case analysis is required: evidence from which a jury could find that the defendant's stated reason is false combined with evidence satisfying the plaintiff's *prima facie* case may be, but is not necessarily, sufficient to meet the plaintiff's ultimate burden of proving discrimination.[137] The relevant factors in making this determination " 'include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the

employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.' "[138]

*1. December 1997—to Supervisor, Bridge Operations at George Washington Bridge*

Plaintiff cannot make out a *prima facie* case for this position because he did not apply for it despite its posting.

■ Although a plaintiff alleging failure to promote ordinarily must show that he or she applied for the specific job at issue, that requirement does not apply in this Circuit where "the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them."[139] Here, plaintiff's claim that he was unaware of the opening does not help him because it is undisputed that the opening in fact was posted. *Brown* and *Mauro* require both that (1) the plaintiff be unaware of the position or express general interest *and* (2) the job not be posted.[140] Thus,

133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

**134.** *Id.; Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.), *cert. denied,* — U.S. ——, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001); *James,* 233 F.3d at 154.

**135.** *Byrnie,* 243 F.3d at 102; *see, e.g., James v. N.Y. Racing Ass'n,* 233 F.3d 149, 152 (2d Cir.2000) (agreeing with the district court that the evidence, taken as a whole, cannot reasonably support an inference that plaintiff's discharge was motived by age-based animus).

**136.** *Byrnie,* 243 F.3d at 102.

**137.** *James,* 233 F.3d at 156–57; *Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000).

**138.** *James,* 233 F.3d at 156 (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097) (alteration in original).

**139.** *Mauro v. S. New England Telecom., Inc.,* 208 F.3d 384, 387 (2d Cir.2000) (reversing grant of summary judgment based on plaintiff's failure to apply when there was genuine issue of fact regarding whether employer posted job). The exception created in *Mauro* is based on *Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998), in which the panel noted that cases from other circuits in which a formal application was not required shared certain characteristics: (1) the position was not posted, and (2) either (a) the employee had no knowledge of the position, or (b) the employee made an effort to apply for the specific position through an informal procedure endorsed by the employer. *Id.* at 710 n. 2.

**140.** *Mauro,* 208 F.3d at 387; *Brown,* 163 F.3d at 710 n. 2.

plaintiff's claimed unawareness is insufficient.

■ Plaintiff cannot escape the fact that this opening was posted by artificially bifurcating the selection process into two distinct phases—one consisting of the posted process and another consisting of Ms. Holmes' "appointment" of Mr. Eadicicco—and then claiming that the second phase was not posted. The reality of the situation is that Ms. Holmes did not hand-pick Mr. Eadicicco behind closed doors without giving other applicants a chance. She selected Mr. Eadicicco because the interview process provided an unsatisfactory pool of applicants. Plaintiff did not put himself in that pool, and he has offered no explanation as to why he was not aware of the opening despite its posting.[141]

2. *August 1998—to Manager, TB & T Operations at Staten Island Bridges*

Plaintiff has made out a *prima facie* case for this claim. He is a member of a protected class and did not get the job, thus satisfying the first and third prongs. The fourth prong is satisfied because Mr. Butcher chose Ms. Trimarchi, a white woman, for the position instead of plaintiff. Finally, the third prong is satisfied. Plaintiff was qualified, at least under the *de*

*minimis* standard applicable here. Furthermore, although he never formally applied for the specific position, there is at least a genuine issue of fact regarding whether plaintiff expressed interest in being promoted to a managerial position of this type,[142] and the position was not posted.[143] Accordingly, plaintiff's claim regarding this position fits into the exception to the application requirement enunciated in *Mauro* and *Brown*.[144]

Defendants have articulated a legitimate, non-discriminatory reason for choosing Ms. Trimarchi over Mr. Evans. They assert that Ms. Trimarchi was uniquely qualified for the position in view of her prior service as Supervisor of Bridge Operations at the Staten Island Bridges. Mr. Butcher explains that Ms. Trimarchi was the logical choice for the job because normally when an employee is successful as the Supervisor of Bridge Operations, that employee moves into the Manager of Operations position when it becomes available.[145] Mr. Butcher explains further that he did not consider Mr. Evans for the position because he never had been assigned to work at the Staten Island Bridges, nor had he worked in operations at a facility with the exception of a temporary assignment during the management

---

**141.** One gets the distinct feeling that plaintiff is engaging in some slippery linguistics on this point. In his affidavit, he states that "Mr. Eadicicco was offered the position after the job bulletin was not successful without me ever being informed that the job was available." Evans Aff., DI 50, Ex. *aa* ¶ 17. It is not clear whether plaintiff means that he knew about the job bulletin and interview process but did not know that the job was available *after* the normal interview process was over, or that he never knew about the opening at all. Likewise, in the next paragraph he states "I would have applied for the position ... if I had known that Ms. Holmes was seeking to fill it and I was given the opportunity to apply." *Id.* ¶ 18. Again, the language is ambiguous. Plaintiff may be re-

ferring only to his awareness regarding the availability of the position *after* the normal interview process had finished. In any case, plaintiff is stuck with the fact that the position in fact was posted.

**142.** *See* Evans Dep., DI 49, Ex. C, at 399 (indicating that he applied in 1995 for bulletinized position of Supervisor of Operations at Staten Island Bridges).

**143.** Def. 56.1 St. ¶ 16.

**144.** *Mauro,* 208 F.3d at 387; *Brown,* 163 F.3d at 710 n. 2.

**145.** Butcher Aff. ¶ 13.

development program.[146] Thus, according to the Authority, Ms. Trimarchi's in-depth knowledge of the operational aspects of the Staten Island Bridges set her apart from other employees within the TB & T, including Mr. Evans.[147]

■ Plaintiff has brought forward no evidence from which a reasonable jury could conclude that the Authority's stated reasons are pretextual. Plaintiff relies heavily on his claim that he had more experience and was better educated than Ms. Trimarchi, and that he participated in the management development program whereas she had not. Disastrously for his case, however, plaintiff focuses on Ms. Trimarchi's experience prior to becoming the Supervisor of Operations at the Staten Island Bridges in 1995 rather than her experience at the time she was hired for the position at issue here.[148] Any claim plaintiff might have had regarding Ms. Trimarchi's 1995 promotion to Supervisor of Bridge Operations at the Staten Island Bridges now is time barred, and plaintiff cannot revive it by attacking defendant's stated reasons for the 1998 promotion based on Ms. Trimarchi's pre–1995 qualifications. It is for this reason that the statements allegedly made by Ronell Greene in 1995 to the effect that plaintiff was more qualified than Ms. Trimarchi and that she received the supervisor position because people "downtown" wanted her to have it are of little or no consequence here.[149]

Focusing on the 1998 promotion, plaintiff at best has established that he had held supervisory- or management-level jobs at the Authority for more years than had Ms. Trimarchi and that he had participated in the management development program whereas she had not. But defendant's stated reason for choosing Ms. Trimarchi was her unique experience as Supervisor of Bridge Operations at the Staten Island Bridges, the very facility at which the new position had opened up, and neither of plaintiff's claimed advantages tends to undercut this explanation. Certainly, plaintiff's credentials are not "so superior to the credentials of [Ms. Trimarchi] that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " [150]

In perhaps his best argument, plaintiff attacks Mr. Butcher's assertion that the supervisor of operations at a facility normally replaces the operations manager when the latter person leaves his or her job.[151] Plaintiff contends that, while this may be true for white employees, it is not

---

**146.** Butcher Aff. ¶ 15.

**147.** *Id.*

**148.** Pl.Mem. 20. Plaintiff makes much of the fact that Ms. Trimarchi was an administrative assistant before 1995 and basically ignores the intervening three years. In a statement characteristic of these tactics, plaintiff argues that "Ms. Trimarchi admits she had no experience at running the day to day operations of the Staten Island Bridges while she was an Administrative Assistant there." *Id.* Arguments such as these border on insult to the Court's intelligence.

**149.** *See* Evans Dep., DI 49, Ex. C, at 398–403.

**150.** *Byrnie,* 243 F.3d at 103 (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.,* 164 F.3d 277, 280–81 (5th Cir.1999)). This standard, which applies when a plaintiff resists summary judgment solely on the basis of a comparison of qualifications, *see id.,* is appropriate here because, as discussed below, plaintiff's only other arguments against summary judgment on this claim consist of conclusory allegations and unsubstantiated generalizations about the hiring practices at the Authority.

**151.** Pl.Mem. 20.

for African Americans.[152] To support this claim, he points to Leonard Hicks, an African American who was Supervisor of Operations at the Holland Tunnel at the time that Mr. Carvagno was promoted to Manager of Operations at the Holland Tunnel. Ultimately, however, plaintiff's argument is unconvincing. First, Mr. Butcher actually stated that if an employee is "successful" in his or her supervisor position at a field facility, then that employee normally moves into the manager position at the facility when it becomes available.[153] Plaintiff has introduced no evidence regarding Mr. Hicks employment history that indicates how Mr. Hicks was carrying out his supervisory duties at the time the manager position at the Holland Tunnel became available. Furthermore, even if plaintiff had done so, this one incident involving Mr. Hicks combined with plaintiff's own experiences would not be sufficiently probative of the Authority's motivation to support an inference of pretext or discrimination in plaintiff's case.[154]

Plaintiff makes two further arguments that are worthy of note, but it is unclear whether he considers them an attack on defendant's stated reasons for the employment decision at issue here or an independent avenue to a showing of discrimination.

First, plaintiff asserts that the Authority, at least as far as he is aware, gave non-bulletinized positions only to white people, with the result that white people did not have to compete for their management positions while African Americans such as himself did.[155] While general trends such as this in a proper case might tend to establish pretext or intentional discrimination,[156] plaintiff made no attempt to substantiate this assertion with statistics or any other admissible circumstantial evidence. The Court is left with plaintiff's bald assertion that racial animus motivated the Authority's posting practice.[157]

Finally, plaintiff argues also that the TB & T has no standards for determining why

---

**152.** Evans Dep., DI 59, Ex. A, at 499.

**153.** Butcher Aff. ¶ 13.

**154.** Statistical evidence of this kind of pattern might be sufficient to support an inference of discrimination, but plaintiff's pool of one employment decision (possibly a handful if we include plaintiff's own experiences) over a period of five years is too small to be significant. *See, e.g., Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001) (noting that Second Circuit has cautioned against attributing much if any significance to the fact that another member of the protected class suffered an adverse employment action along with plaintiff); *Pollis v. New Sch. for Soc. Research,* 132 F.3d 115, 121 (2d Cir. 1997) ("A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present. The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the

inference of discrimination to be drawn from it."); *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984) (noting that intentional discrimination may be inferred from a pattern or practice adverse to the protected group, but that considerations such as small sample size may detract from the value of such evidence).

**155.** Evans Dep., DI 30, Ex. P, at 376–377 ("Most jobs that were filled in TB & T by departmental options, *that I know of anyway,* were filled by whites, this being one and several others." (emphasis added)).

**156.** *E.g., Rosenblatt v. Bivona & Cohen, P.C.,* 969 F.Supp. 207, 218–19 (S.D.N.Y.1997) (summary judgment denied when plaintiff introduced statistical and other circumstantial evidence showing general firm policy and disparate treatment of those in the protected class).

**157.** *Cf. Meiri v. Dacon,* 759 F.2d 989, 998 ("[C]onclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e).").

and when a position will be posted.[158] To the contrary, the evidence reveals that the TB & T does not post positions when those in charge feel that one particular candidate is uniquely qualified for the position. Failure to post the position alone does not support an inference that the defendants' stated reasons are false or that the Authority unlawfully discriminated against plaintiff.[159]

In short, plaintiff has produced no evidence from which a reasonable jury could conclude that the Authority's stated reasons are false.[160]

Turning to the ultimate question of intentional discrimination, because plaintiff's *prima facie* case is not strong and there is no evidence of pretext, the Court is compelled to conclude that plaintiff has failed to carry his burden as a matter of law. Accordingly, defendants are entitled to summary judgment dismissing this claim.

> 3. *September 1998—to Manager, TB & T Operations at Holland Tunnel; February 1999—to Manager, TB & T Physical Plant at Holland Tunnel and to Manager, TB & T Physical Plant at Staten Island Bridges*

These three failures to promote share common features and yield to a common analysis. All three jobs were posted, and plaintiff applied for each. In each case, a person not a member of plaintiff's protected class was selected for the job. Thus, plaintiff has made out a *prima facie* case.

In each case, the defendants contend that the choice was the result of the successful candidate performing better than Mr. Evans on the interview. Accordingly they have articulated a legitimate, non-discriminatory reason for the adverse employment actions at issue here.

Moving to the issue of "discrimination *vel non*," plaintiff attacks the defendants stated reason, arguing that defendants do not adequately explain what criteria were used to judge a successful interview performance or how a successful interview performance translated into the selection of the candidate best able to do the job. Defendants provided detailed evidence, consisting of evaluation forms and spreadsheets ranking the candidates, for the interview process for the manager position at the Holland Tunnel. They did not provide similar materials for the two physical plant manager positions. In any case, the evaluation forms give some guidance because they list the "dimensions" or characteristics against which a successful interview performance should have been judged. However, as the forms illustrate, the "score" for each dimension was entirely a matter of the interviewer's subjective judgment at the time of the interview. The illegible notes on the pages of the evaluation forms reveal little to nothing about what the interviewees actually said.

The subjectivity of the process is suggested by the testimony of Mr. Bardzilow-

---

**158.** Pl.Mem. 21.

**159.** *E.g., Mauro*, 208 F.3d at 387–388 (assuming that positions were not posted but finding that summary judgment was proper because plaintiff failed to rebut defendant's legitimate, non-discriminatory reasons for adverse employment actions).

**160.** The Court considers the 1989–1990 incidents involving Ms. Lockette to be inconsequential to all of plaintiff's claim in this case.

Ms. Lockette, even if her statements to plaintiff revealed racial animus towards him, which is not clear, played no part in any of the relevant decisions in this case. Similarly, the Ray Brown incident in 1992 consists of nothing but a racially-neutral fight and a "stray remark" unrelated to any of the relevant decisions. *See, e.g., Slattery*, 248 F.3d at 92 n. 2 (dismissing stray remarks unrelated to the employment decision as not worthy of discussion).

ski, one of the interview panel members, who characterized one candidate's "exceptional" interview performance as being "very forthright, very open and very responsive to the questions," with the candidate giving "good examples of the work he had done" including "his focus on customer service and subordinate development."[161] When asked how plaintiff's interview performance differed, Mr. Bardzilowski explained that plaintiff had not been "enthusiastic."[162]

■ Despite defendant's efforts to clarify its interview process, we are faced with three employment decisions that were essentially subjective and imprecise. The Second Circuit's recent decision in *Byrnie v. Town of Cromwell, Board of Education* sheds substantial light on how to deal with such a situation.

*Byrnie* in many respects was quite similar to this aspect of the present case—it involved an employment decision made on the basis of subjective criteria used during an interview process.[163] First of all, *Byrnie* makes clear that there is nothing *per se* unlawful about basing an employment decision on subjective criteria, "such as the impression an individual makes during an interview."[164] However, the case makes clear also that an employer seeking to rebut a plaintiff's *prima facie* case by offering a non-discriminatory reason for its decision must give an

" 'explanation of its reasons [that is] clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.' Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of ... qualifications, no inference of discrimination can be drawn.' "[165]

*Per contra*, when the explanation is far from clear and specific and entirely subjective, an inference of discrimination may well be permissible.[166]

Additionally, plaintiff raises some valid points regarding qualifications.[167] First, in the case of the Staten Island vacancy, the position went to Mr. McKee who, unlike plaintiff, did not hold an engineering degree, despite the fact that the posted requirements for the job included such a credential. Mr. Curnyn, who was selected for the manager position at the Holland

---

161. Bardzilowski Dep., DI 49, Ex. L, at 28. Speaking about the superior qualities of Mr. Curnyn's interview, Mr. Bardzilowski explained that "his was the longest interview, very thorough" and that he remembered "the way he responded to the questions and explained every aspect satisfactorily to us." He concluded: "It was just an excellent interview." *Id.* at 56.

162. *Id.* at 29.

163. *See Byrnie*, 243 F.3d at 104–05.

164. *Id.* at 104.

165. *Id.* at 105 (quoting *Meiri v. Dacon*, 759 F.2d 989, 996–97 (2d Cir.1985) and *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980)) (second alteration in original).

166. The Court does not intend to suggest that defendants' use of subjective and imprecise criteria alone would be sufficient to permit a finding of pretext and intentional discrimination. However, the possibility that race was a factor in application of such subjective criteria or the formation of such subjective impressions weighs against summary judgment for defendants on these claims. *See Byrnie*, 243 F.3d at 105.

167. Discrepancies in qualifications between applicants, when they are combined with other evidence tending to show pretext, have some probative value even if they do not rise to a level such that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* at 103.

Tunnel, had no experience in the TB & T prior to his interview for the position.[168] Messrs. Greene and Bardzilowski failed to review Mr. Prince's personnel file and were not aware that Mr. Prince once had failed a drug test and apparently absconded with an Authority motor vehicle. A jury might reasonably conclude that the members of the interview panel closed a blind eye to the weaknesses of white candidates.[169]

The most potentially damning piece of evidence is plaintiff's testimony that Mr. Greene, an African–American member of the panel, told him around the time of the Holland Tunnel decision that Mr. Bardzilowski, a white member of the panel, had the "final say" and that Mr. Greene considered plaintiff to be the more qualified applicant.[170] If believed, this testimony would tend to show that defendant's "better interview" rationale, along with its criteria and spreadsheets, was just a cover for Mr. Bardzilowski's decision, made over the better judgment of an African–American member of the panel.[171] Moreover, this testimony, if believed, would justify a conclusion not just that defendants' stated reason is false, but that racial discrimination played a prohibited role in the decisions. In consequence, summary judgment is inappropriate on these three failure to promote claims.

#### 4. January 2000—to Supervisor, E–ZPass Customer Service

Plaintiff's claim with respect to this position must be dismissed because plaintiff challenges the appointment only on the theory that the Authority gave mobility assignments only to white persons but has produced no evidence whatsoever to support that contention.

#### 5. January 2000—to Manager, TB & T Operations at George Washington Bridge

Plaintiff has made out a *prima facie* case for this claim. The Authority chose Mr. Eadicicco, a white man, for the promotion over Mr. Evans. Mr. Evans was qualified. Although he did not formally apply for the job, he expressed interest in the position to Mr. Muriello, and the Authority did not post the position, thus fitting this situation into the exception provided for by *Mauro* and *Brown*.[172]

Defendants have articulated two nondiscriminatory reasons for choosing Mr. Eadicicco over Mr. Evans. First, Mr. Philmus stated that Mr. Eadicicco was hand-picked for the position because the Bridge was in the final stages of testing and implementing a highly complex traffic management project known as ITS and Mr. Eadicicco, as Supervisor of Bridge Operations of the George Washington Bridge, had been involved with ITS from

---

**168.** Bardzilowski Dep., DI 49, Ex. L, at 56.

**169.** There is evidence in the record that the human resources department screened the written statements and personnel files of the candidates for the panel prior to the interviews. Accordingly, the panel may have been justified in failing to look more closely at applicants' qualifications and history. However, this is a question for the trier of fact, and plaintiff enjoys the benefit of all favorable inferences on this motion for summary judgment.

**170.** Evans Aff., DI 49, Ex. B, at 242–43.

**171.** This statement was allegedly made by Mr. Greene in connection with the decision to hire Mr. Curnyn for the manager position at the Holland Tunnel. If the jury believed plaintiff's testimony, then defendants' failure to offer the interview evaluation forms and spreadsheets for the other two promotion decisions might take on special poignancy.

**172.** *Mauro*, 208 F.3d at 387; *Brown*, 163 F.3d at 710 n. 2.

the inception and was more familiar with the system than anyone else.[173] He stated also that Mr. Eadicicco was chosen because he had worked successfully at the Bridge for a number of years in a variety of operational positions at both management and nonmanagement levels.[174] In other words, the Authority contends that Mr. Eadicicco was uniquely qualified for the position because of his singular knowledge of the ITS system and his extensive field experience at the facility.

▇▇ Plaintiff presents no evidence from which a rational juror could conclude that defendants' stated reasons are false. Once again, plaintiff touts his own qualifications for the position. His arguments are to no avail because defendants do not claim that Mr. Evans was not minimally qualified for the position. Plaintiff's experience [175] and participation in the management development program are no answer to defendants' assertion that they valued field experience, job performance, and familiarity with the ITS system.[176] The Authority was entitled to value field experience over superior education and two years of management training from the late 1980s.

Plaintiff claims also that the Authority's heavy emphasis on ITS to the exclusion of other potential job responsibilities is suspect. But plaintiff presents no evidence except his own opinion that this emphasis was unwarranted. As noted above, Mr. Evans' statement that all of his managers told him that E–ZPass was a more important project than ITS is inadmissible hearsay and thus may not be considered on this motion.[177]

Plaintiff argues also that he was denied participation in a training program for ITS

---

**173.** Philmus Aff. ¶ 4.

**174.** *Id.*

**175.** Plaintiff's argument that defendants "acknowledge that Mr. Evans['] managerial experiences far exceeded Mr. Eadicicco's," Pl. Mem. 18, is misleading. In the deposition testimony cited by plaintiff to support this purported acknowledgment of Mr. Evans' managerial superiority, Mr. Greene did compare the managerial experience of Mr. Evans and Mr. Eadicicco, but he did so as of 1997, not as of January 2000. Moreover, Mr. Greene's testimony is not as favorable to Mr. Evans as plaintiff's memorandum implies. *See* Greene Dep., DI 49, Ex. G, at 74–75.

**176.** Plaintiff makes much of the fact that Mr. Eadicicco drove a truck and worked for years in positions that did not require a college degree. He points out that Mr. Eadicicco did not earn a college degree until 1989, thirteen years after he started with the Authority. Pl. Mem. 19. Plaintiff's argument ignores the fact that by January 2000 Mr. Eadicicco had a full two years of experience working as Supervisor of Operations at the relevant facility, closing any gap that once might have existed.

Furthermore, plaintiff's assertion that he could have mastered the ITS system within a matter of months because of his engineering degree is unpersuasive. First, plaintiff's opinion about his own abilities is unsubstantiated by any concrete evidence. Second, defendants' preference for a candidate who already had such mastery, as opposed to a candidate who might have been able to catch up, does not in any way suggest that the ITS rationale was a pretext.

Finally, plaintiff's argument that white graduates of the management development program received management level positions without having the kind of field experience Mr. Eadicicco had is without merit. First of all, this argument impliedly concedes that in *this* particular context, Mr. Eadicicco in fact was uniquely qualified in comparison to plaintiff. Furthermore, this type of argument is better suited to a disparate impact claim, but plaintiff has declined, and one can only assume intentionally, to mount a disparate impact case.

**177.** *See supra* Part I.C.; *see also Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (hearsay assertion that would not be admissible at trial is

under "dubious circumstances,"[178] apparently invoking this as evidence Mr. Eadicicco received "preferential treatment" in the hiring process.[179] A jury could conclude from plaintiff's evidence that Adrienne Holmes was looking for two candidates for a "pilot course" on ITS in late December 1999, that plaintiff expressed interest in it to Ms. Holmes on or about January 28, 2000, and that she notified him two days later that the classes already were oversubscribed. A memo had instructed Ms. Holmes to send in her list of candidates by December 30, 1999. This situation, as unfortunate as it may have been for Mr. Evans, has no bearing on the promotion at issue here. Plaintiff implies that he was denied a chance to participate in these classes in order to enable the Authority to compare him disadvantageously with Mr. Eadicicco. But plaintiff offers the Court no evidence establishing a connection between the promotion decision and the events surrounding the pilot course. Moreover, even if Mr. Evans had participated in this pilot course in January 2000, it strains credulity to argue that the course somehow would have given plaintiff experience with ITS comparable to that of Mr. Eadicicco, who was involved with ITS from its inception.

█ Plaintiff maintains that there was no serious effort on the part of management to compare Mr. Evans credentials with Mr. Eadicicco's. Plaintiff is right. It is undisputed that the position was not posted and that Mr. Evans was not actual-

ly considered for the position. Mr. Napolitano, the driving force behind Mr. Eadicicco's appointment, stated in his deposition that it would not have mattered to his decision that Mr. Evans had fourteen years of management experience,[180] an engineering degree, and had participated in the management development program.[181] As noted above, mere failure to post a position and consider theoretically qualified candidates is not sufficient to support a finding of pretext or discrimination.[182]

Turning to plaintiff's ultimate burden of proving intentional discrimination, plaintiff has only an ordinary *prima facie* case and has failed to present evidence sufficient to support a finding of pretext. Plaintiff has presented no other evidence strengthening his own or undermining the Authority's case. Viewing the record as a whole, the Court concludes that plaintiff cannot carry his ultimate burden as a matter of law. Therefore, defendants are entitled to summary judgment dismissing this claim.

### 6. September 2000—to Manager, TB & T Operations at Holland Tunnel

Plaintiff has made out a *prima facie* case for this claim. Mr. Evans applied for the job and was qualified for the position. The Authority promoted Anthony Carvagno, a white man, to this position instead of Mr. Evans.

█ Defendants have articulated a legitimate, non-discriminatory reason for choosing Mr. Carvagno over Mr. Evans.

---

not competent material for a Rule 56 affidavit).

**178.** Pl.Mem. 18.

**179.** Pl.Mem. 17.

**180.** The question put to Mr. Napolitano assumed that Mr. Evans had 14 years of management experience. Napolitano Dep., DI 49, Ex. N., at 46. This is Mr. Evans' characterization of his work experience and is not

necessarily accepted by the Authority as accurate.

**181.** *Id.*

**182.** *E.g. Mauro,* 208 F.3d at 387–88 (finding that summary judgment was proper on failure to promote claim because of lack of showing of pretext or discrimination when positions were not posted and two candidates were chosen without competitive process).

The Authority contends that Mr. Carvagno was better qualified for the Manager of Operations position at the Holland Tunnel because he had more field experience than the plaintiff, he was intimately familiar with facility operations whereas plaintiff was not, and he had distinguished himself through his job performance whereas plaintiff's job performance had been average.

Plaintiff's proffered evidence would not support a finding of pretext. Plaintiff claims that he was "specifically trained for this management position and had considerably more management experience than Mr. Carvagno." [183] The Court sees no reason why plaintiff's experience in the management development program in the late 1980s should be considered "specific training" for this position at the Holland Tunnel. Furthermore, while plaintiff may have been working at the supervisor or management level for a longer period of time than Mr. Carvagno, it is undisputed that Mr. Carvagno held supervisor positions at the Staten Island Bridges and the Lincoln Tunnel in the two years prior to this promotion opportunity. The Authority certainly would be justified in regarding this management-level experience in field facilities to be more relevant to the available position than Mr. Evan's management-level experience in the Toll System and Technology program and the Operation and Maintenance Services unit. It is undisputed that, other than assignments he received during the management development program, plaintiff has never been assigned to a facility in the field.[184]

Plaintiff attacks Mr. Philmus's contention that Mr. Evans was not as good an employee as Mr. Carvagno. The Authority does not claim that plaintiff was a bad employee, as plaintiff seems to imply, but rather that plaintiff's work performance was "average." [185] Plaintiff argues that there is no evidence to support this characterization of his work.

The record does not bear out plaintiff's argument. Mr. Greene characterized plaintiff's performance while working under him as "acceptable." [186] The performance review documents submitted by defendants for 1993–1994 show that Mr. Evans received an overall rating of "competent and dependable," which was the third highest rating out of six.[187] While defendants failed to come forward with performance review materials for other years, plaintiff himself states that he "never ... received lower than a fully competent rating for [his] annual performances and [his] management style was criticized in writing only once." [188] This evidence is all consistent with the notion that plaintiff's work performance had been average rather than exceptional during his tenure with the Authority. Defendants' failure to produce documentary evidence of Mr. Carvagno's performance history gives the Court some pause, but it is plaintiff's burden to establish pretext, not the defendants' burden to disprove it. Despite the benefit of discovery, plaintiff introduced no evidence calling into question Mr. Carvagno's performance history.

Plaintiff's final argument is that "[n]o other Management Development graduate was expected to have experience in positions that did not require a college degree in order to become an operations manag-

**183.** Pl.Mem. 25.

**184.** Def. 56.1 St. ¶ 9.

**185.** Philmus Aff. ¶ 24.

**186.** Greene Dep., DI 49, Ex. G, at 18.

**187.** DI 32, Exs. B, C.

**188.** Evans Aff., DI 50, Ex. *aa* ¶ 38.

er" and that "[t]he defense never explains why all of a sudden there was a shift away from the remaining Management Development graduates to white people with little or no management experience to take over supervisor of operations and operations manager positions." [189] As noted several times in the course of this opinion, this argument is ill-suited to proving intentional discrimination in a particular promotion decision. Moreover, plaintiff makes no attempt to substantiate his claims about these general trends within the Authority with statistics or other admissible evidence.

■ Failure to prove that a defendant's stated reason is false is not determinative, however.[190] As noted above, a district court should examine the record as a whole and consider the strength of the plaintiff's *prima facie* case, the probative value of any proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case.[191] Here, the plaintiff's *prima facie* case is reasonably strong. More importantly, here the Court is presented with one of those rare occasions on which there is evidence in the record that does not necessarily disprove the employer's stated reasons, but nonetheless undermines the employer's case to such an extent that an inference of intentional discrimination is permissible.

In this case, plaintiff applied and interviewed for this position in September 2000, approximately one month after he filed the complaint in this action. Mr. Durando, who interviewed Mr. Evans and recommended Mr. Carvagno for the position, admitted in his deposition that he was aware of plaintiff's lawsuit at the time of the decision.[192] In these circumstances, a jury would be justified in concluding that plaintiff's lawsuit played a motivating, if not an exclusive, role in Mr. Durando's decision. While this is more obviously a case of potential retaliation for protected conduct, a jury could conclude also that plaintiff's race was connected inextricably to his lawsuit and that an illicit consideration of the lawsuit was tantamount to illicit consideration of plaintiff's race. Therefore, defendants' motion for summary judgment is denied with respect to this claim.

---

**189.** Pl.Mem. 25, 26.

**190.** *See James*, 233 F.3d at 156 n. 3. In the course of examining what evidence may satisfy a plaintiff's "ultimate burden" after the Supreme Court's decision in *Reeves*, the Second Circuit wrote as follows:

"In a parenthetical clause following its citation to *Fisher*, the Court described *Fisher* as requiring that plaintiffs 'introduce sufficient evidence for jury to find both that employer's reason was false *and* that real reason was discrimination.' With all respect the Court was mistaken. *Fisher* does not require evidence that the employer's reason was false. It requires only evidence adequately supporting a finding of discrimination. As we have explained here, *Fisher* (like *Reeves* ) states that evidence satisfying the minimal *McDonnell Douglas* prima facie case, combined with evidence of the

falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination, and that whether such evidence is sufficient to sustain a finding of discrimination in any given case turns on analysis of the particular evidence in the case."
*Id.* (emphasis in original) (citation omitted); *see also Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000) (holding that district court erred when it instructed jury that plaintiff was required to disprove the employer's stated reasons for its adverse employment actions); *Schnabel*, 232 F.3d at 87 ("If the employer articulates such a reason, the plaintiff has the burden of proving that his age was the real reason for his discharge.").

**191.** *James*, 233 F.3d at 156.

**192.** Durando Aff., DI 59, Ex. B, at 27–28.

## B. Retaliation

Plaintiff claims that he was passed over in 1998 for the position of Manager of TB & T Operations and Maintenance Services in retaliation for his having voiced complaints of racial discrimination. He contends also that he was denied the position of Manager of Operations at the Holland Tunnel in September 2000 as a result of his filing this lawsuit on August 3, 2000.[193]

■■■ In order to make out a *prima facie* case of retaliation, "the plaintiff must first present ... evidence sufficient to permit a rational trier of fact to find [1] that [ ]he engaged in protected participation or opposition ..., [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." [194]

If plaintiff makes out a *prima facie* case of retaliation, the burden shifts to defen-

dants to articulate a legitimate, non-retaliatory reason for its adverse employment action.[195] The ultimate burden then shifts to the plaintiff to point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.[196]

### 1. Manager, TB & T Operations and Maintenance Services in 1998

■■■ Here there is evidence that plaintiff engaged in a protected activity, as he complained about racial discrimination at the Authority as early as 1995. The Authority obviously knew of those complaints, and plaintiff did not get the promotion. But there is no evidence that Mr. Muriello was aware of plaintiff's complaints.[197] Nor is there any evidence from which a trier of fact might conclude that any knowledge he might have had was connected to the decision. Certainly this is not a case where, for example, the close temporal proximity between protected activity and an adverse

---

**193.** Plaintiff's memorandum of law makes no other individualized arguments regarding retaliation in connection with other instances of the Authority's failure to promote him. Instead, plaintiff lumps his "retaliation" claims together with his hostile work environment claims. *See* Pl.Mem. 29–31. Plaintiff does not even attempt to demonstrate how the evidence in the record establishes a *prima facie* case of retaliation for these failures to promote. Accordingly, insofar as plaintiff's complaint includes allegations of retaliation in connection with each instance when the Authority failed to promote him, those claims are dismissed and denied except to the extent explicitly preserved by this opinion.

**194.** *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001) (internal quotation marks omitted) (Title VII case).

**195.** *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001) (title VII retaliation claims are analyzed under *McDonnell Douglas* burden shifting analysis).

**196.** *Cifra*, 252 F.3d at 216; *see also Gordon*, 232 F.3d at 117 (noting, in context of jury trial, that plaintiff need not disprove the employer's proffered non-retaliatory reasons and may prevail by proving that an impermissible factor was a motivating factor in the decision).

**197.** Nor does any evidence of Muriello's conduct or other circumstances suggest that he was aware of plaintiff's complaints, and there is no evidence that he acted explicitly or implicitly upon the orders of a superior with such knowledge. *See Gordon*, 232 F.3d at 117 (even if agent denies direct knowledge of protected activities, jury may find retaliation so long as it finds "that the circumstances evidence knowledge of the protected activities or [it] concludes that an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge").

employment action gives rise to an inference of causation.[198] In consequence, there is a complete failure of proof as to causation, and summary judgment dismissing this claim is appropriate.[199]

### 2. Manager, Operations at the Holland Tunnel in September 2000

Filing this lawsuit was a protected activity. The Authority knew of the lawsuit because it was served with a copy of the complaint. Mr. Durando, who interviewed Mr. Evans and recommended Mr. Carvagno for the position, was aware of plaintiff's lawsuit.[200] The Authority's failure to promote plaintiff to this manager position satisfies the third prong of the *prima facie* case. Finally, in contrast to the 1998 manager position discussed above, the close temporal proximity between plaintiff's filing of this lawsuit and the failure to promote him to this manager position is sufficient to give rise to an inference of causation.

■ The Court has addressed already the defendants' proffered legitimate, nondiscriminatory reasons for promoting Mr. Carvagno instead of Mr. Evans, as well as plaintiff's evidence in support of an finding of discrimination. If anything, the evidence supporting a finding of retaliation is stronger than the evidence supporting a finding of discrimination because the jury need not take the logical step from plaintiff's lawsuit to his race. Accordingly, plaintiff has carried his ultimate burden for purposes of this motion and summary judgment is denied on this claim.

### III. Hostile Work Environment

Plaintiff's papers indicate that the focus of his hostile work environment complaint

---

**198.** *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 281 F.3d 333, 351–52 (2d Cir.2002); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir.2001); *Gorman–Bakos v. Cornell Co-op. Ext.*, 252 F.3d 545, 554 (2d Cir.2001); *Cifra*, 252 F.3d at 217.

**199.** Putting aside plaintiff's inadmissible reiteration of Mr. Ortiz's hearsay statement regarding Mr. Butcher, *see supra* Part I.C., the arguments in plaintiff's memorandum regarding this position appear geared towards a disparate treatment claim rather than a retaliation claim. In other words, they fail to deal with the issue of causation. This is unfortunate for the plaintiff because for this promotion the complaint states a claim for retaliation only. In any case, plaintiff's arguments are severely flawed in their own right.

Plaintiff speculates that only African Americans who do not complain about discrimination can succeed at the Authority. Pl. Mem. 22. This argument begs the question to be decided in this lawsuit and has no evidentiary support besides the completely innocuous admissions of Mr. Greene, Ms. Holmes, Mr. Butcher, and Mr. Myers that they have never complained of or observed instances of racial discrimination taking

place at the Authority. *Id.* In essence, plaintiff asks the Court to assume that these people must be lying based on nothing more than his unsubstantiated hunch; this the Court cannot do. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998) (Calabresi, J.) ("[A] jury cannot infer discrimination from thin air.").

Plaintiff relies also on a statement by Mr. Butcher that "normally if an employee is successful as the supervisor of operations they move into the manager of operations position when it becomes available." Pl. Mem. 21 (quoting Butcher Aff. ¶ 13). Apparently, plaintiff is implying that because he was "successful" as a supervisor of TB & T Operations and Maintenance Services, he should have been the logical choice to take over the manager position. Plaintiff takes Mr. Butcher's words out of context; he was referring to the relationship between the supervisor and manager positions at facilities in the field, a context not relevant to this position. More importantly, plaintiff's argument depends on his own subjective characterization of himself as a "successful" supervisor, for which he defines no parameters and provides no concrete support.

**200.** Durando Aff., DI 59, Ex. B, at 27–28.

is the events that occurred in the year 2000—the failure of Muriello and Crowley to pursue his complaint of late February or early March, the office taping incident, the Authority's alleged lack of response to plaintiff's complaint about that event, the reprimand by Ms. Holmes for raising the taping incident at a staff meeting, and the chain of events involving the medical department.[201]

■ The legal standards defining discrimination by condoning a hostile work environment and the burden a plaintiff must shoulder to defeat a motion for summary judgment are well established:

"The Supreme Court has stated that 'whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" A plaintiff establishes a claim for hostile environment sexual harassment if she demonstrates (1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment, and (2) a sufficient basis for imputing the conduct that created the hostile environment to her employer.

"Although a continuing pattern of hostile or abusive behavior is ordinarily required to establish a hostile environment, a single instance can suffice when it is sufficiently egregious. We have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory."[202]

The first question therefore is whether the facts, viewed in the light most favorable to plaintiff, would permit a trier to find that plaintiff was subjected to "harassment that was sufficiently severe or pervasive to alter the conditions of h[is] employment."[203] As any harassment must be race-based to be actionable, this requires consideration of whether the conduct at issue was race-based, reasonably would have been perceived by persons of color to be offensive, and was so perceived by plaintiff.[204]

■ It is important at the outset to separate fact from allegation. The record would permit the conclusion that Muriello and Crowley did not act on plaintiff's expression of concern about the effect of noncompetitive appointments on minority advancement. The office taping incident arguably was race-based in the sense that a jury could find that it was intended to ridicule plaintiff's assertion of a race-based grievance. But there is no evidentiary basis for considering either the reprimand administered by Ms. Holmes, an African American, or the patent and promptly cor-

---

**201.** Pl.Mem. 26–31.

**202.** *Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 135 (2d Cir.2001) (citations omitted).

**203.** *Id.*

**204.** *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Torres v. Pisano,* 116 F.3d 625, 630–33 (2d Cir.) (noting that standards for evaluating hostile work environment claims are the same whether discrimination is based on race or sex), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753–54 (3d Cir.1995) (noting that plaintiff's claim that employer permitted a hostile work environment to exist for African Americans at a meter repair shop was governed by the principles set out in *Harris* and *Meritor*); *Hill v. Taconic Developmental Disabilities Servs. Office,* 181 F.Supp.2d 303, 320–21 (S.D.N.Y. 2002).

rected misunderstanding relating to the medical department as having been race-based. And even if they actually were race-based, no reasonable trier of fact could find that an African American reasonably would have perceived the reprimand or the foul up relating to the medical department as racially offensive.[205]

Plaintiff has failed to put forth sufficient evidence to survive summary judgment on the hostile work environment claim. As the Circuit's language quoted above makes clear, race-based incidents in the workplace, whether a single act or a sequence of events, must be sufficiently severe as to alter the conditions of the plaintiff's employment.[206] And this sequence of events simply does not rise to that level. The only clear and arguably race-based misconduct was the taping incident which, although evidently hurtful to the plaintiff, ranks relatively low on any scale of egregiousness. There is no evidence to suggest any culpability in the failure of Mr. Muriello and Ms. Crowley to follow up on plaintiff's purported late February or early March complaint. Ms. Crowley disagreed with plaintiff's opinion that minorities had been disadvantaged, and there is no evidence that plaintiff presented her and Mr. Muriello with any data to support his view or otherwise gave any basis for supposing that his complaint was well founded. Had he done so, one perhaps might have inferred from their inaction some racial animus or indifference; absent such action, there is no basis for such an inference.[207] Nor is there evidence sufficient to support an inference of animus or indifference in the response to plaintiff's complaint about the office taping. The staff was instructed immediately that such conduct was unacceptable. Once plaintiff wrote his memorandum to the chief of staff, the matter was thoroughly investigated, the culprit found, and a written apology tendered.

In view of the foregoing, there is no need to determine whether there is a sufficient basis for imputing the conduct upon which plaintiff relies to the Authority.

### IV. The Claims Against the Remaining Individual Defendants

#### A. Section 1981 Claims

This action remains pending against individual defendants Boyle, Butcher, Holmes, Muriello and Duke.

 As individual supervisors and co-workers may not be sued under Title VII because Title VII is limited to "employers,"[208] plaintiff proceeds against them under 42 U.S.C. § 1981, which is not so limited.[209] But Section 1981 falls considerably short of subjecting such persons to broad liability.

The leading Second Circuit case on individual liability under Section 1981, *Whid-*

---

**205.** The Court, however, does not doubt plaintiff's sincerity in claiming that he so perceived them.

**206.** Horace Cardoza's affidavit does next to nothing to support Mr. Evan's claim that he personally was subjected to a racially hostile work environment.

**207.** In substance, plaintiff's point here fails for the same reason as a disparate impact claim would have failed on this motion. Plaintiff no doubt thinks that the noncompetitive appointments work to the disadvantage of minorities, and for all the Court knows he may be right. But he has not provided anyone with any evidence to support such a theory. *See supra* note 9.

**208.** *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**209.** *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir.2000).

*bee v. Garzarelli Food Specialties, Inc.,* involved the question whether the owner-principals of a McDonald's restaurant franchise could be held liable under Section 1981 on a hostile work environment claim primarily directed at the corporation that owned the restaurant and employed the plaintiff. The Court of Appeals acknowledged the availability of personal liability in appropriate circumstances. It went on to hold that, "a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action'" in order to establish individual liability for employment discrimination under Section 1981.[210]

■ In light of *Whidbee,* there is no basis for a Section 1981 claim against Messrs. Boyle and Muriello, Dr. Duke, or Ms. Holmes. Mr. Boyle is not even alleged to have had a part in any of the relevant events. Dr. Duke's only involvement here was in the chain of events involving the medical department, which cannot survive defendants' motion even as against the Authority. And while Ms. Holmes and Mr. Muriello played more significant roles in some of the events at issue here, the only aspects of plaintiff's complaint that survive defendants' motion are the four promotions described above.[211] There is no evidence that either had any part in any of those four incidents, and accordingly none of their actions could be causally connected with any actionable discrimination.

■ Mr. Butcher appears to have been involved in filling the jobs of Manager of TB & T Operations at the Holland Tunnel and Managers of Physical Plant at the Staten Island Bridges and at the Holland Tunnel, incidents as to which there are issues of material fact for trial. Because factual issues remain as to whether Mr. Butcher's actions were causally connected to the decisions to pass over plaintiff in those cases, that much of the Section 1981 claim against him is sufficient to survive the motion. The balance of the Section 1981 claim against him must be dismissed, however, for the same reasons as the Section 1981 claim against Ms. Holmes and Mr. Muriello. As there was no other actionable discrimination, his actions cannot be causally linked with any discriminatory action in those instances.

## B. State Law Claims

The complaint asserts claims against Mr. Butcher, Ms. Holmes, and Mr. Muriello under the NYSHRL, the NYCHRL and New Jersey's Law Against Discrimination ("LAD") and against Ms. Holmes alone for intentional and negligent infliction of emotional distress. The individual defendants contend that these state statutes do not apply to the Authority or to them. Plaintiff has not resisted dismissal of the state law claims.

■ Defendants are correct that the respective antidiscrimination laws of New York and New Jersey do not apply to the Authority because it is an agency created by an interstate compact.[212] *A fortiori,*

---

**210.** *Id.* (quoting *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir.1991)).

**211.** Although only four factual incidents are implicated, five claims against the Authority survive summary judgment analysis: (1) disparate treatment: 1998—to Manager, TB & T Operations at Holland Tunnel; (2) disparate treatment: February 1999—to Manager, TB & T Physical Plant at Holland Tunnel; (3) disparate treatment: February 1999—to Man-ager, TB & T Physical Plant at Staten Island Bridges; (4) disparate treatment: September 2000—to Manager, TB & T Operations at Holland Tunnel; (5) retaliation: September 2000—to Manager, TB & T Operations at Holland Tunnel.

**212.** *E.g., Settecase v. Port Auth.,* 13 F.Supp.2d 530, 535 (S.D.N.Y.1998) (collecting cases).

they do not apply to the Authority's agents acting in their capacities as such.[213]

As neither side has addressed the intentional and negligent infliction of emotional distress claims, there is no reason for the Court to do so at this time.

## V. Conclusion

Defendants' motion for summary judgment is disposed of as follows:

1. It is granted in all respects, and the action dismissed, as to defendants Boyle, Muriello and Duke.

2. It is granted in all respects as to defendant Butcher save that it is denied with respect to the Section 1981 claim based on the failures to promote for the position of Manager of TB & T Operations at the Holland Tunnel and the positions of Managers of Physical Plant at the Staten Island Bridges and at the Holland Tunnel.

3. It is granted in all respects as to defendant Holmes save that it is denied with respect to the claims of intentional and negligent infliction of emotional distress.

4. It is granted in all respects as to the Authority save that it is denied with respect to the Title VII and Section 1981 claims based on the four failures to promote discussed in the text.

SO ORDERED.

**213.** *See Ballinger v. Del. River Port Auth.*, 311 N.J.Super. 317, 709 A.2d 1336, 1342 (1998).