Neville EVANS, Plaintiff,

v.

**THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al., Defendants.**

**No. 00 Civ. 5753(LAK).**

United States District Court, S.D. New York.

Feb. 25, 2003.

Stephen T. Mitchell, for Plaintiff.

Keith E. Harris, Megan Lee, for Defendants The Port Authority of New York and New Jersey, Ernesto Butcher and Adrienne Holmes.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

The plaintiff in this employment discrimination case, Neville Evans, is an engineer at the Port Authority of New York and New Jersey (the "Authority") who believes that he repeatedly has been passed over for promotion because he is African–American. The complaint asserted also that plaintiff was subjected to a hostile work environment and that defendants retaliated against him for complaining about alleged racial discrimination at the Authority. The hostile work environment claim, some of the failure-to-promote claims, and claims against a number of individual defendants were dismissed on summary judgment.[1] The case was tried to a jury, which returned a verdict in favor of the remaining defendants on all points.

■ On February 19, 2003, plaintiff submitted a motion for a new trial to the Clerk. It was not accompanied by proof of service or by a memorandum of law as required.[2] The motion therefore is denied. In the alternative, however, the Court denies the motion on the merits. Only three points warrant discussion[3]—plaintiff's contentions that (1) the Court's imposition and enforcement of time limits on the presen-

---

**1.** *Evans v. Port Authority,* 192 F.Supp.2d 247 (S.D.N.Y.2002) (*"Evans II"*).

**2.** Fed. R. Civ P. 5(a) ("every written motion ... shall be served upon each of the parties"), 5(d) (papers shall be filed "together with a certificate of service"); S.D.N.Y. Civ. R. 7.1

("[e]xcept as otherwise permitted by the court, all motions ... shall be supported by a memorandum of law").

**3.** The remaining points are dealt with in summary fashion in the appendix.

tations of both sides was inappropriate and prejudicial,[4] (2) the Court questioned the veracity of plaintiff's counsel while accepting without questions representations made by opposing counsel,[5] and (3) the verdict was against the weight of the evidence.[6] Unfortunately, the nature of plaintiff's motion requires comments concerning his counsel that the Court would have preferred to leave unmade.

### I The Time Limitation

Prior to trial, the Court imposed time limits on the parties' presentations. Despite expansion of those limits during the trial, the plaintiff ran out of time prior to the completion of defendants' case. While the Court gave its reasons when it enforced the time limit against the plaintiff,[7] further elaboration is appropriate in light of the motion now before the Court.

### A. The Background of the Time Limitation—Problems With Plaintiff's Counsel Prior to Trial

As the record in this case amply reveals, plaintiff's counsel, Stephen T. Mitchell, Esq., failed from the outset to cooperate in discovery and pretrial proceedings.[8]

The most egregious example was his failure to respond to the Authority's October 2000 interrogatories, which sought the identity of all persons with knowledge or information relevant to the subject matter of this action and the aspects of the matter concerning which each was knowledgeable. This episode is amply detailed in *Evans v. Port Authority*, 201 F.R.D. 96 (S.D.N.Y. 2001) (*"Evans I"*), *as clarified by* Order, Jan. 21, 2003, and will not be repeated here. But it was not the only instance of what can be described only as Mr. Mitchell's recalcitrance during pretrial proceedings.[9] The Court notes here only one additional example: Mr. Mitchell's behavior concerning the joint pretrial order.

The joint pretrial order initially was due in June 2001. On or about June 15, 2001, Mr. Mitchell submitted a document entitled "Plaintiff's Proposals for a Joint Pretrial Order" to which he signed the name of the Authority's attorney, followed by his own initials, thus suggesting that the document was submitted on behalf of plaintiff and the Authority defendants.[10] It later developed that counsel for the Authority defendants had authorized Mr. Mitchell to submit a joint pretrial order on her behalf *provided* certain changes were made in plaintiff's draft. The changes were not made. Mr. Mitchell signed her name to the document and submitted it anyway. He never told his adversary that he had done so.[11] But that was not the end of the story.

---

**4.** Mitchell Aff. ¶¶ 21–23.

**5.** *Id.* ¶¶ 41–42.

**6.** *Id.* ¶¶ 30–33.

**7.** Tr. 981–90. (Unless otherwise indicated, all references to "Tr." are to the trial transcript.)

**8.** This Court is not alone in encountering such problems with this attorney. *See Carr v. Queens–Long Island Med. Group, P.C.*, Nos. 99 Civ. 3706(NRB), 02 Civ. 1676(NRB), 2003 WL 169793 (S.D.N.Y. Jan. 24, 2003) (Francis, M.J.) (sanctioning Mr. Mitchell for bad faith discovery misconduct). *See also* Mitchell v.

Fishbein, 216 F.Supp.2d 283 (S.D.N.Y.2002) (noting the Appellate Division's refusal to recertify Mr. Mitchell to the state court 18–B panel).

**9.** *See, e.g.*, Order, Aug. 5, 2002 (citing some other instances).

**10.** It was not signed on behalf of counsel for defendant Lee Home, who subsequently was dismissed from the action.

**11.** Tr. 4; Letter from Megan Lee, Esq., to Court (June 27, 2001); *see also* Letter from Douglas Langholz, Esq., to Court (June 28, 2001).

The Court did not approve the pretrial order submitted by Mr. Mitchell, as it did not bear signatures on behalf of all of the defendants. On April 5, 2002, the Court granted in part and denied in part the Authority defendants' motion for summary judgment dismissing the complaint.[12] Bearing in mind both that the decision had narrowed the case and the absence of an approved joint pretrial order, the Court, on August 5, 2002, directed the submission of a joint pretrial order by September 3, 2002. But Mr. Mitchell, who as plaintiff's counsel was obliged to prepare and submit a draft to the defendants' counsel,[13] simply ignored the order.[14] In consequence, no joint pretrial order ever was prepared.[15]

### B. The Adoption of the Initial Time Limits

As the trial approached, the Court focused on the potential difficulties of managing the trial in the absence of a joint pretrial order, particularly given the problems concerning the identification of possible witnesses that are detailed in *Evans I* and the deficiencies in Mr. Mitchell's papers on the summary judgment motion.[16] Accordingly, on January 14, 2003, the Court issued an order to show cause why the presentations of each side should not be limited to 13.5 hours.[17] This reflected the Court's best estimate of the time required competently to present this case based, among other things, on the nature of the remaining issues, the June 2001 proposed pretrial order, and the number of witnesses each side likely would call.

On January 17, 2003, Mr. Mitchell responded with a letter vaguely claiming that he would need more time. He stated that he intended to call 23 witnesses, including several who had been precluded by the decision in *Evans I*. At oral argument, despite its earlier order to the contrary, the Court decided to allow plaintiff to call a number of the previously precluded witnesses.[18] While it adopted the 13.5 hour time limitation, it made clear that it remained flexible and would consider, as the trial progressed, any reasonable application to expand this limitation.[19] It cautioned, however, that it would take into account, in passing on any such requests, whether the time allotted had been used efficiently.[20]

### C. The Commencement of the Trial

By the time the case went to trial, all that remained were three alleged failure-to-promote claims and a narrow retaliation claim although, to be sure, plaintiff was entitled to, and the Court granted, latitude to adduce background evidence and to attempt to demonstrate an insensitivity or

---

12. *Evans II*, 192 F.Supp.2d 247.

13. *See, e.g.*, Order, June 4, 2001 (endorsing Letter from Stephen T. Mitchell, Esq., to Court (June 1, 2002)).

14. Defendants' counsel were not wholly without fault either.

15. Trial originally was set for September 10, 2002. Order, Aug. 7, 2002. It was postponed, ultimately until January 21, 2003, to accommodate Mr. Mitchell. *See* Letter from Stephen T. Mitchell, Esq., to Court (Aug. 17, 2002).

16. *See, e.g., Evans II*, 192 F.Supp.2d at 251 n. 5.

17. Order, Jan. 14, 2003.

18. Tr., Jan. 17, 2003, at 2–44, especially 25–34 and 40–44. (It should be noted that Drs. Altema and Clarke, who were referred to in this transcript but not ruled upon there, ultimately were allowed to testify despite the Court's ruling in *Evans I*.)

19. *Id.* 47–48.

20. *Id.*

unresponsiveness by the Authority toward racial prejudice in the workplace.[21]

Plaintiff began his case by calling Joseph Durando, who was involved in the selection process for one of the positions to which plaintiff aspired. Mr. Mitchell spent part of his direct examination questioning Mr. Durando about the qualifications the Authority had established for the position. At the end of the day, out of the presence of the jury, the Court commented to Mr. Mitchell as follows:

> "[I]t may be helpful simply to say to Mr. Mitchell that you did not make much use of your time today. You could have offered in evidence the job bulletin. You would have had in front of the jury right away exactly what the qualifications were, and you would have saved a large amount of time that was spent essentially arguing with the witness about whether he remembered what the job posting said and various other things that the record will show, all of which were established conclusively in the space of less than 60 seconds once the job bulletin came in.
>
> I am not inviting an answer. I am simply telling you how you could have done this much more effectively, and I

am doing it because I want you to focus on how to present your case."[22]

On the following day, plaintiff elected to play hours of excerpts from a videotaped deposition of Joseph Bardzilowski, a retired Authority executive who had been involved in the selection of successful candidates for one or more of the positions at issue in the case. As the deposition and trial transcripts reveal,[23] plaintiff chose unnecessarily to play a good deal of argumentative colloquy between counsel.[24]

As the trial continued, Mr. Mitchell asked patently objectionable questions. Much of his questioning was argumentative or assumed facts unsupported by or contrary to the record. Thus, he often consumed a good deal of time reformulating questions in response to well taken objections. Nevertheless, the Court kept both sides apprized of the time remaining to each on at least a daily basis, and it reiterated its willingness to reconsider the time limit on the basis of a demonstrated showing of need.

### D. Enlargement of the Time Limit

On January 26, 2003, plaintiff made such an application,[25] claiming that he still had

---

**21.** The trial began with a claim by Mr. Mitchell that the Authority's counsel suddenly had sprung three proposed witnesses on him whom they never had identified before. Tr. 3. Counsel for the Authority stated that she had sent Mr. Mitchell a letter in June 2001 in which she had requested that these three witnesses be added to the joint pretrial order that Mr. Mitchell then supposedly was preparing. *Id.* 4. Mr. Mitchell flatly denied having been so advised. *Id.* 5. The Court then held an evidentiary hearing at which the Authority produced documentary evidence demonstrating beyond a doubt that Mr. Mitchell had been advised of the three witnesses in June 2001 and that his denial to the Court had been false. Tr. 5–14; DX 1001, 1002.

**22.** Tr. 151–52.

**23.** *See, e.g, id.* 162–63, 168 (instructions by the Court that the jury should ignore the lawyers' colloquy)

**24.** Mr. Mitchell eventually claimed that the Court had insisted that the deposition be videotaped and that the tape be played as opposed to the transcript read. This assertion simply is false. *See* Endorsed Order, Jan. 2, 2003 (directing the parties to "[p]reserve the testimony by deposition" without mentioning videotape); Tr. 2 (Mr. Mitchell advises Court, prior to jury selection, of his wish to play the videotape); *id.* 59 (Mr. Mitchell, in his opening statement, informs the jury of his plan to play the videotape).

**25.** Letter from Stephen T. Mitchell, Esq., to Court (Jan. 26, 2003).

nine witnesses to present. The Court held a conference to deal with this request. After going over the list of remaining witnesses in detail and eliciting stipulations that obviated any need for two of the nine, the Court expanded the time allotments from 13.5 to 17 hours.[26] Mr. Mitchell responded that "I think that we will make that deadline," [27] and he raised no objection.

### E. Plaintiff Runs Out of Time

Despite essentially having reached agreement on the time limitations, Mr. Mitchell's performance after the expansion of the time allotment did not improve. This is well illustrated by his use of fully one half of a trial day, January 29, 2003, to present the testimony of the head of the Authority's medical department and two of plaintiff's doctors.

#### 1. The Medical Testimony

A few words of background. As *Evans II* relates in more detail, plaintiff had disputes with supervisors and others in the early part of 2000, which culminated in an informal reprimand on May 23.[28] On the following day, he went to the Authority's medical department, was found to have high blood pressure, and was sent home in a car (provided by the Authority) with instructions to see his private physician. At trial, the parties stipulated that plaintiff later was put on absent-without-leave status after he failed to appear for an ap-

pointment at the medical department on June 9, 2000; that his pay therefore was stopped for a period of roughly two weeks; that it later was determined that a nurse in the medical department had told him that he did not have to come in on June 9; and that his back pay then was sent to him by Federal Express.[29] Despite this stipulation, plaintiff, as was his right, proceeded to claim that he had been put on absent-without-leave status and that his pay had been withheld in retaliation for his having complained about alleged racial discrimination to his supervisors. What was not his right was to waste an enormous amount of time with matters having no real relationship to the question whether, notwithstanding the stipulated facts, retaliatory animus motivated this *contretemps*.

Mr. Mitchell began by calling Dr. Martin Duke, head of the Authority's medical department, whose only connection to these events was that he had received a call on June 9 from plaintiff's personal physician, Dr. Altema. Dr. Duke's first hand knowledge was limited to the call, in which Dr. Altema stated that the plaintiff would not keep his appointment for that day, and to the fact that the medical department then had referred plaintiff for administrative disposition—i.e., it told his supervisor that he had failed to report as directed, leaving the determination of whether to take action with the supervisor.[30] Nevertheless, Mr. Mitchell con-

---

**26.** The Court did so despite its stated views that (a) the original allotment of 13.5 hours had been adequate, (b) Mr. Mitchell's presentation of the case, to that point, had been inefficient and repetitious, and (c) Mr. Mitchell's focus on the medical department incident, *infra* at Subsection I.E.1, was not a good use of time, although the Court would not rule it out. Tr., Jan. 27, 2003, at 21–23.

**27.** *Id.* 23.

**28.** *Evans II*, 192 F.Supp.2d at 258–60.

**29.** Tr. 492–93; *see also* Tr., Jan. 27, 2003, at 7–9.

**30.** Tr. 645–48, 659–60.

There was no evidence that the medical department knew anything of Mr. Evans' ongoing disputes with his supervisors, his complaints of alleged racial discrimination, or anything else other than his medical condition and history.

sumed the better part of an hour to elicit these facts—which were not disputed to begin with and which he then proceeded to elicit again from Dr. Altema—and to have Dr. Duke read entries that had been made by others in plaintiff's medical records.

After Dr. Duke testified, Mr. Mitchell called Dr. Altema. Mr. Mitchell elicited from Dr. Altema that plaintiff had high blood pressure,[31] that plaintiff had complained of alleged harassment at work,[32] and that Dr. Altema had recommended that plaintiff not return to what Dr. Altema described as "the hostile environment at work."[33] In addition, Dr. Altema testified that he had told an Authority doctor that plaintiff would not return until Dr. Altema thought plaintiff could do so without detriment to his health.[34]

This testimony was of little or no utility. There was no dispute concerning plaintiff's history of hypertension. The fact that, by June 2000, he had complained of alleged racial discrimination at work likewise was undisputed. Dr. Altema's statement that plaintiff would not show up on June 9 was recorded in the Authority's medical records, the admissibility of which was unchallenged. Thus, the only conceivable point of Dr. Altema's testimony was to show that plaintiff did not keep his appointment on June 9 because his doctor had advised against it, and it was cumulative on this issue.[35] In any case, Dr. Altema's testimony had nothing to do with the real issue: whether the Authority (a) put plaintiff on absent-without-leave status to enforce an alleged policy of requiring all of its employees, absent extraordinary circumstances not even arguably present here, to appear for evaluation by its physicians whenever they are on sick leave, regardless of the views of their personal physicians, or (b) instead used the failure to show up on June 9 as a pretext to punish plaintiff for his complaints.

But the capstone of the medical evidence was the testimony of Dr. Kildare Clarke, an emergency room physician and alleged psychiatrist called by plaintiff. Dr. Clarke, it turned out, failed the board certification examinations in psychiatry;[36] has seen only a small number of psychiatric patients,[37] some of whom are clients of Mr. Mitchell with legal claims;[38] and had had his medical license revoked for issuing unlawful prescriptions for marijuana for the purpose of deceiving a court.[39] Despite this pedigree, and a caution from the Court (out of the presence of the jury) that offering testimony from such an alleged expert could seriously undermine the credibility of his case,[40] Mr. Mitchell insisted on proceeding with this witness[41] to elicit the opinion that plaintiff was suffering from post-traumatic stress disorder as a result of an office prank.[42]

The wastefulness of the time devoted to Dr. Clarke's testimony is patent. As the hostile work environment claim had been

---

**31.** *Id.* 681–82, 686, 697–99.

**32.** *Id.* 685.

**33.** *Id.* 686.

**34.** *Id.* 686–88, 691–92.

**35.** *See, e.g., id.* 660–62.

**36.** *Id.* 705.

**37.** He earned his living as an emergency room physician. *Id.* 709–11, 741.

**38.** *Id.* 739–42.

**39.** *Id.* 705–07, 712–13, 715, 717, 740–47; DX EEEE.

**40.** Tr. 715–16.

**41.** *Id.* 716–17.

**42.** *Id.* 720, 749–51.

dismissed on the Authority's motion for summary judgment, the question whether the prank was a proximate cause of any post-traumatic stress disorder was immaterial, as there was no remaining claim for relief in respect of the incident. Even if there had been such a claim for relief, the calling of a witness with Dr. Clarke's background was, to say the least, ill advised and certainly not a reasonable use of limited court resources.

### 2. The Conclusion of the Trial

Plaintiff rested his case-in-chief on January 30, 2003 at page 914 of the trial transcript. The Authority defendants moved for judgment as a matter of law, a motion which, for the most part, was denied. Nevertheless, it is noteworthy that plaintiff consented to the dismissal of the claim against defendant Holmes, the Authority executive who placed plaintiff on absent-without-leave status as a result of the medical department incident and thus the focus of that claim.[43]

Toward the end of the day on January 30, 2003, during the defendants' case, the Court advised plaintiff that he had less than 30 minutes left of his enlarged allotment of 17 hours[44] and said that it would cut plaintiff off when that time was gone. Nevertheless, the Court expanded the 17 hour limit by 15 minutes in response to Mr. Mitchell's claim that he had miscalculated the time remaining and granted plaintiff an additional 20 minutes for summation even if, as proved to be the case, plaintiff used up his entire time allotment.[45]

The Authority then called eleven additional witnesses on its case, although their testimony took only parts of two days and less than 200 pages of transcript. Some of those witnesses already had testified on plaintiff's case-in-chief. Plaintiff finally ran out of time (save the additional 20 minutes granted for summation) after the conclusion of his cross-examination of the Authority's penultimate witness, Ms. Holmes. The only defense witness whom plaintiff could not cross-examine was Ernesto Butcher—a witness whom plaintiff had examined extensively on his direct case and whose testimony during the defense case was partly repetitious and not particularly significant in the overall context of the case.

When plaintiff's time expired, Mr. Mitchell, out of the presence of the jury, asked for an instruction, which the Court gave.[46] Before the lawyers delivered their closing arguments, the Court again mentioned the time limit so that the jurors would not draw any inference from the respective lengths of the parties' closing statements.[47] Finally, the Court charged the jury that it was not to "consider the fact that time limits were established for the presentations of the parties and that

---

**43.** *Id.* 936.

**44.** *Id.* 966–67.

**45.** *Id.* 981–93.

**46.** *Id.* 1193–94. The Court instructed the jury: "The court established a time limit, allotting equal time to both sides in this case for the presentation of the case. That limit was extended once quite substantially. The plaintiff now has used all of his time except for 20 minutes that he has been allotted in addition to all the other time for a closing argument.

So Mr. Mitchell will not be able to ask any more questions in this trial." *Id.* While plaintiff did not request any specific language, he did not object to this instruction.

**47.** *Id.* 1300. The Court stated: "Members of the jury you will recall that both sides were allotted equal time in this trial for all their presentations. The plaintiff used up all their [*sic*] time. I gave them [*sic*] an additional 20 minutes to sum up. The Port Authority is nowhere near its time. Therefore, they may take longer." *Id.* Plaintiff did not object to this instruction.

one side ran out of time. The law permits trial judges for obvious reasons to impose reasonable time limits. The question whether the time limits imposed were appropriate is no part of your concern." [48]

### F. The Time Limit Is No Basis for a New Trial

■■■ Trial courts have discretion to impose reasonable time limits on the presentation of evidence at trial.[49] This is essential if they are to manage their dockets, as many cases compete for trials and for the attention of judges, and no party has an unlimited call on their time. Moreover, in order to prevail on a claim that a time limit was too short, a party must have come forward with an offer of proof showing how its presentation would be curtailed by it and must demonstrate prejudice.[50] Plaintiff has not done so. Not only did he present his entire case-in-chief, but he made no offer of proof of any respect in which his cross-examination of those of the defendants' witnesses whom he did cross-examine was impaired or of what he might have adduced by cross-examining Mr. Butcher on defendants' case. He never identified any probative, non-cumulative evidence that he was prevented by the time limit from presenting.

In the final analysis, the Court is convinced that plaintiff easily could have presented his case fully and effectively in the 13 .5 hours originally allotted. His counsel essentially admitted that the 17 ours ultimately granted was sufficient. He nevertheless consumed more than 17 hours and 35 minutes. In the Court's view, the enforcement of the time limit had no meaningful effect on the presentation of his case.

### II  The Veracity of Counsel

■■■ Plaintiff complains that the Court questioned his counsel's veracity and re-

---

**48.** *Id.* 1367–68. There was no objection to this instruction.

**49.** *E.g., Life Plus Int'l v. Brown,* 317 F.3d 799, 807 (8th Cir.2003) ("Trial courts are permitted to impose reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence."); *Sparshott v. Feld Entm't, Inc.,* 311 F.3d 425, 433 (D.C.Cir. 2002) (("The district court's decisions on how to structure time limits are reviewable only for abuse of discretion.") (citations omitted)); *Amarel v. Connell,* 102 F.3d 1494, 1513–15 (9th Cir.1996) ("The case law makes clear that where a district court has set reasonable time limits and has shown flexibility in applying them, that court does not abuse its discretion. Moreover, to overturn a jury verdict based on a party's failure to use its limited time for witness cross-examination would be to invite parties to exhaust their time limits without completing cross-examination, then appeal on due process grounds."); *Deus v. Allstate Ins. Co.,* 15 F.3d 506, 520 (5th Cir.), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994) ("In the management of its docket, the court has an inherent right to place reasonable limitations on the time allotted to any given trial."); *Borges v. Our Lady of* the Sea Corp., 935 F.2d 436, 442–43 (1st Cir. 1991) ("District courts may impose reasonable time limits on the presentation of evidence."); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 473 (7th Cir.1984) ("[I]n this era of crowded district court dockets federal district judges not only may but must exercise strict control over the length of trials, and are therefore entirely within their rights in setting reasonable deadlines in advance and holding the parties to them. . . .").

**50.** *See, e.g., Life Plus Int'l,* 317 F.3d at 807 ("To preserve this issue for our review, a party must lodge a timely objection to the time limits and must make a proffer of evidence that was excluded for lack of sufficient time."); *Sparshott,* 311 F.3d at 433 ("[A] party arguing that time limits were unfair must also show that he was prejudiced thereby."); *Bank of China v. NBM L.L.C.,* 01 Civ. 0815(DC), 2002 WL 31027551, 2002 U.S. Dist. LEXIS 16979, at *3 (S.D.N.Y. Sept. 11, 2002) ("[A]t no point did defendants identify any admissible, relevant, evidence that they were unable to offer because of the time limits set by the Court.").

fused to credit his verbal representations while not treating his opposing counsel in the same fashion.[51] Even if this were true, it would afford no basis for a new trial. There is no evidence that any such thing ever occurred in the presence of the jury or that plaintiff was prejudiced in any way by any such conduct. But the charge warrants a response.

Discovery in this case was a very contentious process, replete with accusations of dishonesty among counsel. These conflicts made the Court very reluctant to accept the uncorroborated assertions of any of the attorneys in this case. And, even before trial, there was at least some fire amidst all the smoke. During the proceedings that culminated in *Evans I*, for example, Mr. Mitchell falsely represented to the Court that it had excused him from answering the interrogatories then at issue.[52] In consequence, the Court on January 17, 2003 (and possibly earlier) told all counsel that it would not make rulings of substance on the basis of unsworn representations by either side and, if need be, that it would put lawyers on the witness stand.[53]

On the first day of the trial, counsel raised the dispute, discussed above,[54] concerning the Authority's allegedly belated identification of three witnesses. Contrary to plaintiff's suggestion, the Court did not simply accept the word of the Authority's counsel. It insisted that she take the witness stand, allowed plaintiff to cross-examine, and then afforded Mr. Mitchell the opportunity to testify. Only after doing so, and receiving documentary evidence proving that Mr. Mitchell's assertion was inaccurate, did the Court make any finding.[55] And, although it found against Mr. Mitchell, it concluded that it would "charitably put it [i.e., the inaccuracy] down to failure of recollection...."[56]

Later in the trial, another dispute arose, and again the Court declined to resolve the matter by accepting the word of one lawyer over another. When the Authority sought to use defendants' exhibit WWW during cross-examination of one of plaintiff's witnesses, Mr. Mitchell objected, representing that "I never received this document."[57] After the jury was excused, the Authority's counsel countered that the document was an exhibit to its reply papers in support of its motion for summary judgment, which had been served on Mr. Mitchell.[58] The Court, however, did not then rule.[59] Two days later, when the Authority again sought to use the docu-

---

**51.** Mitchell Aff. ¶¶ 41–42.

**52.** *Evans I*, 201 F.R.D. at 98 & n. 14.

In addition, shortly before trial, Mr. Bardzilowski, a retired Authority executive whom both sides wished to call, indicated that he would be unavailable for trial because he was scheduled for surgery. In an unsuccessful effort to demonstrate that the surgery could be postponed, Mr. Mitchell—as he later admitted in open court—telephoned the surgeon, falsely represented that he was a patient, and sought to elicit information about the doctor's availability in an effort to gather ammunition to seek an adjournment. Tr., Jan. 17, 2003, at 48. This of course was a breach of the Code of Professional Responsi-

bility. DR 7–102(a)(5) ("lawyer shall not ... [k]nowingly make a false statement of law or fact").

**53.** Tr., Jan. 17, 2003, at 51.

**54.** *Supra* note 21.

**55.** Tr. 3–14.

**56.** *Id.* 14.

**57.** *Id.* 517.

**58.** *Id.* 518–19.

**59.** *Id.* 519–23.

ment, Mr. Mitchell renewed his objection. The Court then reviewed the official court file and found that the document was attached to the Authority's summary judgment papers.[60] Although Mr. Mitchell admitted that he had received those papers, he persisted in claiming that the copy of the papers he had received was missing this particular document.[61] The Court then directed him to produce the copy of the papers that was served on him. But Mr. Mitchell at that point said that he "would not be able to produce it because what we had to do was take it apart to give it to the Port Authority. So all of the documents that I have are not intact."[62] The Court thereupon found, out of the presence of the jury, that his excuse was "just patently false" and overruled his objection.[63]

Where, as here, attorneys disagree on basic historical facts material to pretrial and other proceedings, courts nevertheless must resolve their disputes. Almost invariably, those decisions involve findings as to which side's account is accurate. As long as those matters are conducted fairly and no inappropriate information comes to the attention of the jury, there is no basis for objection. Those conditions were satisfied here.

### III   The Weight of the Evidence

▮▮▮   In determining whether to order a new trial on the ground that a verdict is against the weight of the evidence:

"The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not."[64]

In this case, the verdict was not against the weight of the evidence. The evidence that those chosen for the various positions to which plaintiff aspired were better or, at least, fully as qualified as the plaintiff was ample, and the jury was entitled to find it persuasive. There was abundant evidence that plaintiff was a problem employee in a number of respects including a tendency to demean subordinates[65] and to be prickly to and obstinate with supervisors.[66] The jury was not persuaded that race played a role in any of the promotion decisions, and the Court—bearing in mind its obligation in considering this aspect of the motion to "weigh the evidence" itself—is in full agreement.[67] And the jury was well within its province in rejecting the retaliation claim, which turned almost entirely on the

---

60.  *Id.* 970–72.

61.  *Id.* 974.

62.  *Id.*

63.  *Id.* 975.

64.  *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978) (quoting 6A Moore's Federal Practice ¶ 59.08[5], at 59–160–59–161 (1973)).

65.  *E.g.*, Tr. 1101–07, 1131–36.

66.  *E.g., id.* 1130–31, 1136–42.

67.  Indeed, it is remarkable that so many of the Authority executives whom the plaintiff accused of discriminating against him because he was African–American themselves were African–American. While the Court acknowledges that members of a minority are capable of discriminating against other members, even on the basis of their shared characteristic, there was no persuasive evidence that this occurred here.

medical department incident and which, in the Court's view, was utterly baseless. Indeed, that entire misunderstanding would have been avoided if Mr. Mitchell, who sent the Authority a belligerent letter in June 2000,[68] simply had written that the nurse in the medical department had told Mr. Evans that he was excused from appearing for the appointment—a fact he did not mention, thus delaying discovery of the error.

### Conclusion

For the foregoing reasons, plaintiff's motion is denied in all respects.

SO ORDERED.

*Appendix*

| Ground | Comment and Record References |
| --- | --- |
| Refusal to permit witnesses to testify to alleged custom and practice of racial discrimination by the Authority in order to satisfy *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Mitchell Aff. ¶¶ 14–19. | It appears that plaintiff claims that the witnesses in question, who are not identified in the Rule 59 motion, were precluded by *Evans I*, so no further explanation is warranted. The Court notes, however, that plaintiff's position at trial was that there was no need to satisfy *Monell* under either Title VII or 42 U.S.C. § 1981. Tr. 1254–58. In so far as Section 1981 is concerned, plaintiff was wrong. *Id.* 1265; *see Anderson v. Convoy*, 156 F.3d 167, 176 n.17 (2d Cir.1998); *Mack v. Port Authority*, 225 F.Supp.2d 376, 383 (S.D.N.Y. 2002). In any case, the point was rendered academic by the jury's finding that there was no discrimination or retaliation. |
| Requirement in June 13, 2001 and unspecified January 2003 orders improperly required plaintiff to reveal identities of trial witnesses prior to filing of pretrial order. Mitchell Aff. ¶¶ 19–20. | The requirement to identify trial witnesses in the June 13, 2001 order was entirely appropriate. *See* Fed. R. Civ. P. 16(c)(7); *see, e.g., Brock v. R.J. Auto Parts and Serv., Inc.*, 864 F.2d 677, 679 (10th Cir.1988) (stating that a district court is not "powerless to compel the production of a witness list during discovery, for such an approach may be necessary to the efficient disposition of a complex case or for other reasons"). Any January 2003 order, moreover, was entered long after the conclusion of discovery and the date on which the joint pretrial order was due, which was September 3, 2002. Order, Aug. 5, 2002. |
| Alleged errors in the charge. Mitchell Aff. ¶¶ 24–29, 47. | The alleged errors in a number of instances rest on the mischaracterization of the charge. To the extent the matters complained of were raised in the charge conference or prior to the submission of the case to the jury, the Court dealt with them on the record. *See* Tr. 1243–63, 1379–80. To the extent they were not properly raised, they have been waived. Fed. R. Civ. P. 51. |
| Alleged discovery violation by the Authority. Mitchell Aff. ¶¶ 34–35. | The Court is unaware of what plaintiff is referring to. In any case, plaintiff never moved to compel production. |

68. *See* DX Q (Letter from Stephen T. Mitchell, Esq., to Richard D. Williams, Esq. (June 12, 2000)).